JUSTUS, Admr.,

v.

OHIO DEPARTMENT OF TRANSPORTATION.

2002-Ohio-4754.]

Court of Claims of Ohio.

No. 97–01775.

Decided Sept. 6, 2002.

2 

Michael F. Colley, David I. Shroyer and Jennifer K. Thivener, for plaintiff.

Betty D. Montgomery, Attorney General, Michael J. Valentine and Peter E. DeMarco, Assistant Attorneys General, for defendant.

EVERETT BURTON, Judge.

{¶ 1} Plaintiff brings this action against defendant alleging claims of negligence and wrongful death. Plaintiff asserts that defendant's negligence was the proximate cause of a collision involving a train and the motor vehicle in which plaintiff's decedent was a passenger. The case was tried to the court on the issue of liability.

{¶ 2} On April 24, 1995, CSX Transportation ("CSX") submitted to defendant a project proposal that included a request for a 12–day closure of a railroad crossing on State Route ("SR") 4 in Seneca County, Ohio. CSX proposed to install new track and to repave the roadway adjacent to the railroad crossing. CSX was responsible for performing all design and construction work on the project. A detour was subsequently approved that rerouted traffic to the west and north and eventually onto SR 162, which crossed the railroad tracks before intersecting with SR 4.

{¶ 3} According to defendant's detour bulletin, the project was to be completed in two weeks. In a letter dated May 3, 1995, Richard Purse, defendant's rail coordinator, notified CSX of the detour route and emphasized that the "route must be re-opened prior to the Memorial Day weekend." On May 15, 1995, the intersection was closed and CSX began its construction project. On May 24, a CSX representative notified defendant that the project would not be complete

before May 31. When defendant demanded that the crossing be reopened prior to the holiday weekend, CSX attempted to construct a temporary pavement at the crossing. However, defendant determined that the temporary pavement was inadequate and CSX continued construction. A detour plan was conceived and implemented by defendant.

{¶ 4} On June 3, 1995, plaintiff's decedent, Charles Boyd, traveled from Columbus in a car with three other teenage boys and headed for Cedar Point Amusement Park. The boys traveled north on SR 4, where they encountered the aforementioned detour that took them to SR 162. It was raining heavily and visibility was reduced when they approached the railroad crossing from the west on SR 162. At the same time, a train was traveling northbound toward the intersection at a speed of 37 miles per hour. The train had its headlights and "ditchlights" on, and the crew began sounding the train whistle and bell approximately one-fourth of a mile south of the crossing. The train crew observed the car as it neared the tracks, but they were unable to stop the train before a collision occurred. Boyd sustained fatal injuries as a result of the incident.

{¶ 5} Plaintiff alleges that defendant negligently implemented the detour process and that its negligence was a proximate cause of Boyd's death. Specifically, plaintiff asserts that defendant failed to follow its own standard operating procedures ("SOP") by approving the detour without the review and approval from a traffic engineer. Plaintiff maintains that a competent traffic engineer would not have approved a detour route that increased the traffic flow at an "ultra-hazardous" crossing.[1]

{¶ 6} In order for plaintiff to prevail upon her claims of negligence, she must prove by a preponderance of the evidence that defendant owed her a duty, that it breached that duty, and that the breach proximately caused the death of plaintiff's decedent. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 21 O.O.3d 177, 423 N.E.2d 467. Defendant has a duty to maintain its highways in a reasonably safe condition for the motoring public. *Knickel v. Ohio Dept. of Transp.* (1976), 49 Ohio App.2d 335, 3 O.O.3d 413, 361 N.E.2d 486; *White v. Ohio Dept. of Transp.* (1990), 56 Ohio St.3d 39, 42, 564 N.E.2d 462.

{¶ 7} Defendant's SOPs 209 and 301 address procedures for instituting and reporting detour routes. The express purpose of Section A of SOP 209 "is to establish the procedures to be used to determine whether work on an existing highway, be it by contract or State force account, will require the closing of the highway with the provision of detours, temporary roads and temporary run-

---

1. The terms "ultra-hazardous" and "extrahazardous" are used interchangeably in this decision.

arounds, or whether traffic will be maintained through all or portions of the construction project, and to establish reporting procedures."

{¶ 8} Archie Burnham, plaintiff's engineering expert, testified that defendant should have followed the procedures outlined in SOP 209 with regard to the detour in question. According to Burnham, defendant was required to have the detour route approved by a traffic engineer. Burnham opined that a traffic engineer would have concluded that it was not reasonably safe to direct traffic over the crossing without further safety precautions. Burnham stated that defendant's engineer could have considered other precautions such as stationing a flagman, seeking a "slow order" from the railroad to decrease the train speed in the area, and delaying the detour until lights and gates could be installed.

{¶ 9} Eugene Madrzykowski, a traffic analyst who designed the detour for defendant, also testified regarding the applicability of SOP 209 to the detour decision. Madrzykowski testified that SOP 209 applied primarily to large highway construction projects that involved work by either independent contractors or the "state force account." Madrzykowski explained that a "force account" referred to construction projects that were performed by defendant.

{¶ 10} SOP 209 section C provides that the decision to use a detour "shall be determined as early as possible" during the "preparation of the pre-scope document," either prior to beginning any preparation of detailed plans or during advance planning. SOP 209 directs the planning or operations engineer to consider the need for a detour during the planning of highway construction. It is also during this process when the planning and design, operations, construction, bridge and traffic engineers are directed to coordinate with each other.

{¶ 11} In this case, defendant was not involved in the planning or construction of the railroad crossing project. Rather, CSX was responsible for all maintenance and construction work. Defendant's involvement with the project was limited to approving the road closure, selecting the detour route and monitoring construction. The court finds that the language of SOP 209 supports defendant's interpretation of its scope regarding detour planning. Accordingly, the court finds that SOP 209 requirements with respect to coordination among defendant's district engineers did not apply to the detour in question because defendant was not involved in the construction planning.

{¶ 12} With regard to the reporting provisions of SOPs 209 and 301, Madrzykowski testified that he followed the SOP sections that applied to the detour decision. SOP 301 establishes "a procedure for reporting partial and complete road closures, detour routes and route openings so that the public and the affected highway personnel may be properly informed." On April 24, 1995, CSX submitted its project proposal to defendant, listing the start and finish dates

for the project as May 15 and May 26, respectively. W. Michael Ligibel, defendant's Administrator of Planning and Projects and the supervisor for railroad activities, forwarded a copy of the CSX proposal to Richard Purse, who coordinated railroad projects for defendant. After talking with railroad officials, Purse sent the proposal to Madrzykowski to implement the detour. On May 1, 1995, defendant issued a detour bulletin to several of defendant's local district personnel and to county, village, and township authorities in areas affected by the detour. The bulletin distribution list included the district operations engineer, the traffic engineer, a Seneca County manager, and the Sandusky traffic office. Although the detour route was not approved in writing by defendant's engineers, testimony established that the route had been used approximately 12 to 20 times prior to May 1995 and that defendant's engineers had no knowledge of any prior complaint from local officials. The court finds that defendant reasonably coordinated with the necessary parties prior to implementing the detour.

{¶ 13} Plaintiff's contention that the accident could have been prevented if defendant's engineers had reviewed the detour plan is predicated upon Burnham's expert opinion that a competent engineer would have considered either installing active warning signals or requiring the railroad to employ a flagman. Plaintiff maintains that these precautions were needed because the increased vehicle traffic that resulted from the detour rendered the railroad crossing "ultra-hazardous." The criteria Burnham used to determine that the crossing was ultra-hazardous included quantitative factors such as both the speed and number of trains and the volume of automobile traffic using the crossing. Burnham also considered driver expectancy as a subjective factor in his analysis.

{¶ 14} Contrary to Burnham's opinion, defendant's expert, G. Rex Nichelson, explained that the term "ultra-hazardous," as it relates to railroad crossings, is not an engineering term but rather a legal term that has been used in engineering contexts as a result of railroad litigation. Nichelson opined that the proper use of the term ultra-hazardous in the context of engineering analysis relates to the distance from which a driver can perceive a train approaching and thereupon stop his vehicle prior to reaching the railroad crossing. According to Nichelson, increased vehicle traffic at a railroad crossing has no bearing on a determination of whether the crossing is ultra-hazardous.

{¶ 15} The Supreme Court of Ohio has defined an "extrahazardous crossing" in an effort to balance the rights and duties of motorists and the railroad. *Hood v. New York, Chicago & St. Louis RR. Co.* (1957), 166 Ohio St. 529, 3 O.O.2d 12, 144 N.E.2d 104. In *Hood,* the court observed that while every crossing is dangerous, only where a crossing is "unusually dangerous" or "extrahazardous" may a railroad be required "in the exercise of ordinary care" to take additional steps to warn. Id. at 534, 3 O.O.2d 12, 144 N.E.2d 104. "[A] railroad

is under no duty to provide extrastatutory warnings at a grade crossing, where not required to do so by any order of the Public Utilities Commission, if there is no substantial risk that a driver in the exercise of ordinary care may be unable to avoid colliding with a train that is being operated over the crossing in compliance with statutory requirements." Id. at 535, 3 O.O.2d 12, 144 N.E.2d 104. To require a railroad to provide extra-statutory warnings at a railroad grade crossing "something well beyond the usual substantial risk of danger" at such a crossing must exist. Id. at 534, 3 O.O.2d 12, 144 N.E.2d 104.

{¶ 16} The evidence produced at trial reveals that the crossing in question was protected by (1) a railroad crossing advance warning sign approximately 759 feet from the crossing, (2) a 50 foot-long painted pavement symbol, (3) an "uneven tracks" and advisory speed sign approximately 350 feet from the crossing, (4) a white stop bar that was painted on the road about 31 feet from the tracks, and (5) reflectorized cross bucks that stood 13 feet from the tracks. No active devices such as flashing lights or gates existed at the crossing. Burnham conceded that the signs and road markings in place at the time of the accident did not violate any applicable standards for railroad crossings. Burnham also agreed that the signs were visible to drivers and that they appropriately warned drivers of the railroad crossing. According to Burnham, a driver's clear-sight view is "the single most important factor" in preventing railroad crossing accidents. The photographs of the crossing submitted at trial show that motorists on eastbound SR 162 had an unobstructed view of the railroad tracks that approached from the south, and that on a clear day a northbound train would be plainly visible to motorists. The court also notes that the only evidence of any similar visibility-related crash at the railroad crossing occurred 17 years prior to the incident.

{¶ 17} Although a heavy rain was falling at the time of the accident, "[w]here the view of the traveler approaching a railroad crossing is obstructed, such circumstances make necessary the use of greater precaution on his part and render his neglect to look or listen all the more culpable." Cates v. Consol. Rail Corp. (1995), 100 Ohio App.3d 288, 296, 653 N.E.2d 1229; North v. Pennsylvania Rd. Co. (1967), 9 Ohio St.2d 169, 38 O.O.2d 410, 224 N.E.2d 757. A driver who is approaching a railroad crossing is obligated to "look and listen for trains, and to do so at such time and place and in such manner as will make the looking and listening effective." Gatt v. Ohio Dept. of Transp. (July 14, 1987), Franklin App. No. 87AP–94, 1987 WL 14233. The court finds that the placement of the signs and road markings provided the driver with an adequate warning and ample opportunity to observe the approaching train and to stop his vehicle prior to crossing the tracks. Although plaintiff has criticized defendant for failing to request a "slow order," the evidence establishes that, at the time of the crash, the train was traveling at 37 miles per hour, well below the 60-mile-per-hour

authorized speed limit. The court concludes that the sole proximate cause of the accident was the automobile driver's negligence.

{¶ 18} Upon review of the testimony and evidence, the court finds that the crossing was adequately protected with sufficient warnings and that there was no substantial risk that a driver exercising ordinary care would be unable to avoid a collision with a moving train. Therefore, there was no duty to provide extra-statutory warnings.

{¶ 19} Plaintiff also alleges that defendant was negligent in failing to ensure that the railroad crossing at SR 4 was reopened in a timely manner. However, the testimony and evidence establish that defendant's employees repeatedly urged CSX to accelerate the pace of construction. Furthermore, plaintiff failed to prove that defendant had any authority either to take over construction on the crossing or to compel CSX to complete the project within the agreed time limit. Accordingly, the court finds that plaintiff's claim that defendant failed to take steps to ensure that the railroad construction was completed in a timely manner is without merit.

{¶ 20} In conclusion, the court finds that plaintiff has failed to prove by a preponderance of the evidence that defendant breached any duty owed to her. Judgment shall be rendered in favor of defendant.

Judgment for defendant.

EVERETT BURTON, J., retired, of the Scioto County Court of Common Pleas, sitting by assignment.