*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0156P (6th Cir.)
File Name: 04a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

DEDRA SHANKLIN,
Individually and as next
friend of her son Jessie Guy
Shanklin,
              *Plaintiff-Appellee,*

          *v.*

NORFOLK SOUTHERN
RAILWAY CO.,
              *Defendant-Appellant.*

No. 01-6449

———————

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 94-01212—James D. Todd, Chief District Judge.

Argued: October 30, 2003

Decided and Filed: May 27, 2004

Before: MOORE and ROGERS, Circuit Judges;
FORESTER, Chief District Judge.[*]

———————

[*] The Honorable Karl S. Forester, Chief Judge of the United States District Court for the Eastern District of Kentucky, sitting by designation.

———————

## COUNSEL

**ARGUED:** Everett B. Gibson, BATEMAN, GIBSON, Memphis, Tennessee, for Appellant. Pamela R. O'Dwyer, PATY, RYMER & ULIN, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Everett B. Gibson, Ralph T. Gibson, BATEMAN, GIBSON, Memphis, Tennessee, for Appellant. Pamela R. O'Dwyer, PATY, RYMER & ULIN, Chattanooga, Tennessee, John W. Chandler, Jr., Memphis, Tennessee, for Appellee.

FORESTER, D. J., delivered the opinion of the court, in which MOORE, J., joined. ROGERS, J. (pp. 28-34), delivered a separate concurring opinion except as to Part V.

———————

## OPINION

———————

FORESTER, Chief District Judge.

Defendant-Appellant Norfolk Southern Railway Company ("Norfolk") appeals the district court's denial of its renewed motion for judgment as a matter of law filed following a jury trial in which judgment was entered in favor of Plaintiff-Appellee Dedra Shanklin ("Shanklin") in the amount of $1,434,014.60. In 1993, a train operated by Norfolk struck the vehicle of Eddie Shanklin, Dedra Shanklin's husband, killing him. The fatal accident occurred at the Oakwood Church Road railroad crossing near Milan, Tennessee. Shanklin filed an action against Norfolk, asserting various common-law claims based on Norfolk's negligence in failing to install adequate warning devices at the crossing and in failing to remove vegetation from the area surrounding the crossing. Shanklin claimed that excessive vegetation and lack

of adequate warning devices resulted in Eddie Shanklin's failure to perceive the imminently oncoming train prior to his vehicle's entry into the crossing, and thus into the train's path. In 1996, a jury found in Shanklin's favor. This Court subsequently affirmed the verdict, but the Supreme Court reversed with respect to the inadequate warning claim, holding that it was preempted by federal regulations governing the installation of warning devices. *Shanklin v. Norfolk So. Ry. Co.,* 529 U.S. 344 (2000).

The Supreme Court remanded and the parties tried the vegetation claim before a second jury in 2001. Shanklin presented evidence, over Norfolk's objection, which tended to demonstrate that Norfolk knew that overgrown vegetation in the vicinity of railroad crossings could obstruct the vision of both automobile drivers and locomotive engineers approaching said crossings. Specifically, Shanklin showed that such overgrown vegetation existed at the Oakwood Church Road railroad crossing, and that Norfolk failed to remove it. Norfolk filed a motion for judgment as a matter of law before the jury retired to deliberate, which the district court denied. After the jury once more found in favor of Shanklin, Norfolk renewed its motion, which the district court again denied.

Norfolk now appeals several aspects of the trial, including the district court's determination that the vegetation claim was not preempted, the district court's admittance of three pieces of evidence tending to show knowledge, the district court's decision to read an allegedly irrelevant Tennessee statute to the jury, and the district court's determination that the evidence was sufficient to permit a reasonable jury to find in Shanklin's favor.

For the following reasons, we AFFIRM.

## I.  JURISDICTION

The district court had proper original jurisdiction over Shanklin's action under 28 U.S.C. § 1332(a) because there existed a diversity of citizenship and the matter in controversy exceeded $75,000. Shanklin is a Tennessee resident and Norfolk is a Virginia corporation. Norfolk timely appealed a final decision of a United States district court and this court accordingly has jurisdiction over this appeal under 28 U.S.C. § 1291.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Oakwood Church Road railroad crossing is located about seven-tenths of a mile from the home Eddie Shanklin shared with his wife, Dedra Shanklin. Eddie Shanklin's commute to the restaurant where he worked brought him across the railroad tracks twice a day for the almost four years he and his wife occupied the residence, and his route the morning of October 3, 1993 was no different.

Eddie Shanklin left his home in the pre-dawn darkness of a clear autumn day at 5:15 a.m., and began his journey to work. As Eddie traveled east on Oakwood Church Road toward the railroad crossing, a Norfolk train was simultaneously approaching the intersection, traveling at about 37 miles per hour. Based on the evidence presented at trial, it appears that Eddie Shanklin slowed his car to 20 miles per hour as he entered the railroad crossing, yet never attempted to further slow or stop his vehicle; there were no skid marks leading to the impact zone. The Norfolk train reportedly sounded its horn for approximately eleven seconds before the impact, yet could not avoid broadsiding Eddie Shanklin's vehicle, pushing it more than one-quarter of a mile before stopping. Eddie Shanklin died as a result of the accident.

On September 26, 1994, Dedra Shanklin filed a wrongful death action in federal court, asserting several common-law negligence claims against Norfolk. Shanklin argued that Norfolk's failure to provide adequate warning devices, sound the train's horn as it approached the crossing within a reasonable time to give adequate warning, and maintain a safe sight distance by reducing the height of any embankment and/or clearing the vegetation from the existing bank proximately resulted in her husband's death. Shanklin also claimed that Norfolk violated Tenn. Code Ann. § 65-6-132, which requires railroad owners to maintain trees on its grounds near the tracks.

On February 16, 1996, Norfolk filed a motion for summary judgment, arguing that federal regulations covering grade crossings, 23 C.F.R. §§ 646.214(b)(3)-(4), preempted all of Shanklin's common-law tort claims. The district court denied Norfolk's motion with respect to the grade-crossing and vegetation claims, holding that said claims were not preempted. The first trial ended in a jury verdict in favor of Shanklin, assigning Norfolk 70% of the responsibility for the accident, and assessing damages of $615,379. Norfolk filed a motion for judgment as a matter of law, or in the alternative for a new trial, which the district court denied.

Norfolk appealed this denial, renewing its argument that federal law preempted Shanklin's claims. This Court affirmed, ruling that government funding of the installation of warning devices at grade crossings did not trigger preemption of state common law claims. *Shanklin v. Norfolk So. Ry. Co.,* 173 F.3d 386, 394 (6th Cir. 1999). Recognizing a circuit split on the issue, the Supreme Court granted certiorari, 528 U.S. 949 (1999), and reversed. *See Shanklin v. Norfolk So. Ry. Co.,* 529 U.S. 344 (2000). The Court held that common-law claims attacking the adequacy of grade-crossing warning signals were preempted from the time federal authorities approved and committed funding to the installation of warning signals. The Court did not speak explicitly to the

vegetation claim, and accordingly remanded the case for rehearing on any remaining claims.

At the second trial, Shanklin asserted her vegetation claim, presenting evidence that Eddie Shanklin's view of the approaching Norfolk locomotive and its headlamp was obscured by trees and vegetation located on Norfolk's right of way. Key expert testimony indicated that the vegetation surrounding the crossing would have prevented Eddie Shanklin from being able to see the train until he was ninety-four feet (three seconds) from the tracks. Shanklin's expert further testified that in order to perceive the threat, react, and stop his vehicle, Eddie, traveling at twenty miles per hour, needed to see the train when he was 135 feet from the tracks. Various additional supporting evidence was admitted over Norfolk's objection. The jury found in favor of Shanklin, and judgment was entered against Norfolk in the amount of $1,434,014.60.[1]

Norfolk now resurrects three evidentiary objections as made at trial. First, Norfolk objects to the introduction of a "sight distance triangle chart," and accompanying diagram, published in the Federal Highway Administration ("FHA") *Railroad-Highway Grade Crossing Handbook* ("Handbook"). Norfolk maintains that the documents do not create a duty with respect to railroads, as the Handbook was written as a guide for traffic engineers. At trial, Shanklin conceded that the evidence did not constitute a legal standard or regulation, but argued that the Handbook had been used by railroads to understand sight distances and thus helped to demonstrate that Norfolk was aware of the sight distance problem. The district

---

[1]The jury deliberated and reached a verdict on January 26, 2001, assessing $831,687 for actual damages and $1,160,000 for Dedra and Guy Shanklin's (the couple's son) loss of consortia. The jury found that Norfolk was 72% at fault and that Eddie was 28% at fault, such that judgment was entered against Norfolk in the amount of $1,434,014.60.

court ultimately admitted the documents. Shanklin later introduced, without objection, the deposition of James McCloskey, an attorney for Norfolk serving on the company's Crossing Oversight Committee, who testified that Norfolk used the sight distance documents in assessing the safety of particular crossings.

Second, Norfolk objects to the introduction of a "policy" developed by Paul Melander, a manager of the Railroad Safety Division of the Tennessee Public Service Commission ("PSC"), addressing potential hazards created by decreased sight lines at railroad crossings. The policy, essentially a recommendation to the state legislature, incorporated the sight distance chart from the Handbook, and the PSC distributed it to all the railroads in Tennessee. While the policy lacked legal authority in that it was not adopted by the PSC or the Tennessee Legislature, the PSC Commissioners had seen the policy and approved its dissemination. Shanklin therefore offered it  for the purpose of showing notice. Norfolk's objection to its introduction was initially sustained. Following Shanklin's offer of proof, however, the court reversed itself because Melander testified that the policy was not just a recommendation, but had become practice in his department. Melander further testified that some railroads followed the policy and others did not. The district court instructed the jury that neither the Handbook nor the policy was a legal standard binding Norfolk.

Third, Norfolk objected to the introduction of deposition testimony given by David Goode, the Chief Executive Officer of Norfolk. The testimony was taken in connection with a 1995 Missouri state court action filed against Norfolk, and Norfolk argued that it should not be allowed because Goode had not been deposed in this case and because his deposition did not address vegetation issues but rather discussed Norfolk's treatment of grade crossings and its safety record in general. Shanklin responded that the general testimony regarding safety at crossings was relevant to Norfolk's

awareness of various problems at the crossings. The district court overruled the objection and permitted Shanklin to show a redacted version of the deposition that covered only issues relating to Norfolk's general grade crossing policies. However, when Shanklin played the video for the jury, all parties discovered that the videotape technician hired by Shanklin failed to omit an inadmissible part of the deposition in which Goode stated that Norfolk had the worst accident rate in the entire industry.[2]

Fourth, Norfolk objects to the invocation of what it deems to be an "ancient" and obsolete Tennessee statute, Tenn. Code. Ann. § 65-6-132. Shanklin presented evidence that Norfolk violated the statute, which prohibits vegetation within a railroad's right of way that is  "six (6") of more inches in diameter, two feet (2') off the ground, and of sufficient height to reach the roadbed if they should fall." *Id.* Shanklin used the statute and the evidence invoking it as additional proof of Norfolk's negligence and reinforced the point by littering the

---

[2]The district court immediately gave the following curative instruction at Norfolk's request:

> THE COURT: Ladies and gentlemen, during the recess, we spent the better part of an hour ruling on objections, taking things out of the deposition that weren't relevant or weren't admissible under the rules of procedure. Through an oversight, one small bit of information got into the deposition that should have been deleted but was not. The only way to cure it at this point is for me to tell you to disregard that last minute or so of the deposition you just saw and the memorandum that was showed to you on the screen. And any reference to it or any testimony about it, you'll disregard it. And if you don't remember what it was, that's good because you don't have to forget it then.

(Apx. pp. 339-43). Norfolk did not move for a mistrial.

court room with several tree stumps taken from the area in question.

## III. PREEMPTION OF THE VEGETATION CLAIM

Norfolk argues that the district court, in holding that Shanklin's vegetation claim was not preempted, improperly limited the scope of the Supreme Court's ruling in *Shanklin v. Norfolk So. Ry. Co.*, 529 U.S. 344 (2000). Norfolk contends that the same federal regulations that preempt inadequate warning device claims also preempt vegetation negligence claims. We review the district court's decision *de novo* because it involves a question of law.

Congress enacted the Federal Railroad Safety Act in 1970, partially to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." 49 U.S.C. § 20134(a). The statute broadly states that all "[l]aws, regulations, and orders related to railway safety . . . shall be nationally uniform to the extent practicable," but it includes a savings clause provision that reads, "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation prescribes a regulation or issues an order . . . covering the subject matter of the State requirement." *Id.* at § 20106. Three years later, Congress created the Federal Railway-Highway Crossings Program, *see* 23 U.S.C. § 130, giving the Secretary of Transportation, acting through the Federal Highway Administration ("FHWA"), the power to promulgate 23 C.F.R. § 646.214(b), which concerns the design of grade crossings.

Most pertinent to this appeal, 23 C.F.R. § 646.214(b)(3)-(4) addresses the circumstances under which automatic gates and flashing signals are required and clarifies that when gates and signals are not mandated, the FHWA has the power to approve or disapprove the alternative type of warning device recommended by a state agency or a railroad. Importantly, no

part of 23 C.F.R. § 646.214(b) addresses the clearing of vegetation.[3]

---

[3] 23 C.F.R. § 646.214 (b)(3)-(4) states:

(b) Grade crossing improvements.
(1) All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards.
(2) Pursuant to 23 U.S.C. 109(e), where a railroad-highway grade crossing is located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of the existing roadway, the crossing shall not be opened for unrestricted use by traffic or the project accepted by FHWA until adequate warning devices for the crossing are installed and functioning properly.
(3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
(A) Multiple main line railroad tracks.
(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
(D) A combination of high speeds and moderately high volumes of Highway and railroad traffic.
(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
(F) A diagnostic team recommends them.
(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.
(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning

The Supreme Court first considered the preemptive power of the Federal Railroad Safety Act ("FRSA") in 1993. *See CSX Transp.*, *Inc. v. Easterwood,* 507 U.S. 658 (1993). The Court held that for a regulation issued by the secretary of Transportation under FRSA to preempt the duties imposed upon the railroads by common law, that regulation must more than "touch upon" or "relate to" the subject matter raised by the common law claim because "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id* at 664. The *Easterwood* Court concluded that 23 C.F.R. § 646.214(b)(3)-(4) preempted the plaintiff's claim that CSX was negligent for failing to maintain adequate warning devices because the regulations "**cover** the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings." *Id.* at 671 (emphasis added).

Later, in reviewing our first *Shanklin* decision, the Court further analyzed 23 C.F.R. § 646.214(b)(3)-(4) to determine whether the regulations "'are applicable' to all warning devices actually installed with federal funds." *Shanklin v. Norfolk So. Ry. Co.,* 529 U.S. 344, 353 (2000). The Supreme Court did not hold that the warning device regulations preempted all state common law claims stemming from a grade crossing accident, but rather held only that the federal regulations displaced Tennessee common law "addressing the same subject." *Id.* at 359. The Court noted: "What states cannot do - once they have installed federally funded devices

device to be installed, whether the determination is made by a State regulatory agency, State Highway agency, and/or the railroad, is subject to the approval of FHWA.

at a particular crossing - is hold the railroad responsible for the adequacy of those devices." *Id.* at 358.[4]

Because the Supreme Court ruling in *Shanklin* does not explicitly extend the preemptive reach of § 646.214(b) to Shanklin's vegetation claim, the issue before this Court is whether the warning device regulations can be read to "cover" the vegetation claim, such that the common law of Tennessee that imposes a duty upon railroads to clear vegetation on their rights of way near railroad grade crossings that prevents motorists from seeing and/or hearing trains approaching those crossings is preempted.

Section 646.214(b)(3) describes under what conditions certain types of warning devices are required; in other words, it "'cover[s] the subject matter' of the adequacy of warning devices installed with the participation of federal funds." *Shanklin,* 529 U.S. at 358. Section 646.214(b)(4) mandates that the FWHA determine what types of warning devices should be installed when the circumstances laid out in § 646.214(b)(3) are not present. The regulations do not appear to focus on vegetational blockage or sight line limitations. At best, they "relate to" or "touch upon" vegetational growth; we cannot conclude that they "cover," in the sense of "substantially subsume," claims of negligence

[4]The Court reaffirmed the notion that the regulations did not just establish a "definitional" federal standard for adequate warning devices, but rather mandated certain requirements when the federal government covered the cost. *Shanklin v. Norfolk So. Ry. Co.,* 529 U.S. 344, 353 (2000). The regulations attached a standard of adequacy to any project involving federal funds. *Id.* Accordingly, the Court held that "once the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, the regulation 'displace[s] state and private decision-making authority by establishing a federal law requirement that certain protective devices be installed or federal approval obtained.'" *Id.* at 354 (quoting *CSX Transp.*, *Inc. v. Easterwood,* 507 U.S. 658, 670 (1993)).

due to failure to clear away vegetation near a railroad bed. *Easterwood,* 507 U.S. at 664.

Norfolk argues that plaintiff's sight distance claim was plainly encompassed by 23 C.F.R. § 646.214(b)(3)-(4), because the regulation requires the DOT to consider, in assessing the need for automatic gates and flashing signals, the presence of "high-speed train operation combined with limited sight distance," 23 C.F.R. § 646.214(b)(3)(i)(C), and the presence of "unusually restricted sight distance," 23 C.F.R. § 646.214 (b)(3)(i)(E). However, this argument takes the regulation's language out of context. While a visual encumbrance, be it overgrown vegetation, a structure, or the contour of the land, triggers the regulatory mandate for certain warning devices, and accordingly preempts common law claims regarding the adequacy of warning signals, it does not follow that the warning device regulations preempt an action based on the alleged failure to eliminate such a visual impediment. The regulations govern warning signals, not vegetation growth. 23 C.F.R. § 646.214(b)(3)-(4) do not define the terms "limited" or "unusually restricted" sight distance, indicate that any sight distance obstructions should be removed, set standards as to how much sight distance should be provided to motorists approaching a grade crossing, contain any guidelines relating to a railroad's obligation to maintain its grade crossings, or even mention "vegetation" or "right of way."

Additionally, the DOT has promulgated other regulations governing the growth of vegetation, demonstrating that when the Department wants to regulate issues concerning vegetation, it has no problem doing so. In particular, 49 C.F.R. § 213.37 states: "Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not . . . (b) [o]bstruct visibility of railroad signs and signals . . ." 49 C.F.R. § 213.37(b). This regulation preempts any state-law claim regarding vegetative growth that blocks a sign immediately adjacent to a crossing,

but it does not "impose a broader duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains." *O'Bannon v. Union Pac. R.R. Co.,* 960 F. Supp. 1411, 1422-23 (W.D. Mo. 1997); *see also Mo. Pac. R.R. Co. v. R.R. Comm'n,* 83 F.2d 570, 577 (5th Cir. 1987)(rejecting ruling that § 213.37(b) controlled a railroad's right of way in its entirety); *Bowman v. Norfolk S. Ry. Co.,* 832 F. Supp. 1014, 1020-21 (D.S.C. 1993), *aff'd* 66 F.3d 315 (4th Cir. 1995)(federal regulations do not preempt claims concerning vegetation outside the area immediately next to the railbed). The comparison of 49 C.F.R. § 213.37 and the adequate warning regulation persuasively shows that 23 C.F.R. § 646.214(b)(3) does not "cover" actions based upon a negligent failure to clear vegetation.

Norfolk calls to the panel's attention two out-of-circuit district court decisions that allegedly preempt sight distance claims based upon the regulations at issue in *Shanklin.* Norfolk misconstrues these decisions, which are unpersuasive. In a pre-*Shanklin* case, *Bryan v. Norfolk & W. Ry. Co.,* 21 F. Supp. 2d 1030 (E.D. Mo. 1997), the district court granted summary judgment to the defendant on a plaintiff's claim that a railroad crossing was "extraordinarily hazardous" because the terrain obscured the approach of trains and because there were no automatic gates or flashing signals guarding the crossing. *Id.* at 1038. The court refused to create "an exception to preemption . . . based on an ultrahazardous condition," *id.,* but *Bryan* is distinguishable because, unlike Shanklin, the plaintiff did not articulate a stand-alone vegetation claim, and instead lumped its visual obstruction claim together with a preemptable claim concerning the failure to provide proper warning devices. *Id.* Norfolk's citation to *Burlington Northern R.R. Co. v. Deatherage,* No. 3:95CV116-B-A, 1997 WL 33384269, (N.D. Miss. May 21, 1997), is equally unavailing, because the plaintiff did not even file a vegetation action in that case. The district court only considered the issue of unlimited sight

distance in determining the applicability of the FRSA's savings clause. *Id.* at *3-4.

On the other hand, the Third Circuit has **specifically** addressed the issue of whether sight distance claims are preempted by 23 C.F.R. § 646.214 (b)(3)-(4), and has found that they are not. *See Strozyk v. Norfolk So. Corp.,* 358 F.3d 268 (3d Cir. 2004). Christopher Stozyk was killed at a railroad crossing when a train owned and operated by Norfolk Southern collided with the truck he was driving. Subsequently, Strozyk's parents filed suit against Norfolk, alleging, *inter alia*, the railroad's negligence for failure to provide proper sight lines for motorists crossing the track. The district court held that 23 C.F.R. § 646.214(b) preempted plaintiff's limited visibility claim, and concluded that because 23 C.F.R. § 646.214(b) "lists 'unusually restricted sight distance' as a factor mandating the installation of active warning devices," it followed that "the standard set by the regulation encompasses not just the ultimate selection of a warning device but [also] . . . 'the appropriate response to limited sight distance or unusually restricted sight distance.'" *Id.* at 272. The Third Circuit Court of Appeals disagreed, noting that, even after the Supreme Court's decisions in *CSX Transp. Inc. v. Easterwood,* 507 U.S. 658 (1993), and *Shanklin v. Norfolk So. Ry. Co.,* 529 U.S. 344 (2000), "state law duties to maintain a safe grade crossing remain viable." *Strozyk,* at 276. The court continued:

> While, as *Easterwood* and *Shanklin* make clear, §§ 646.214(b)(3) and (4) substantially altered the landscape of railroad liability, by restricting tort plaintiffs from interposing state law obligations concerning appropriate warning devices, the regulations do not eclipse those duties ensuring safe grade crossings that are unrelated to warning devices, such as the duty to keep visibility at grade crossings free from obstructions. As those regulations cover the subject matter of warning devices, the Strozyks' claims that Norfolk failed to

> maintain a safe grade crossing, apart from the warning devices, and relatedly failed to ensure clear sight lines of oncoming trains are not preempted.

*Id.* at 276-77.

Accordingly, because we find that the Supreme Court has neither explicitly nor implicitly preempted state common law vegetation claims, and because the adequate warning regulations contained in 23 C.F.R. §§ 646.214(b)(3) and (4) do not "cover" state common law vegetation/sight distance claims, it follows that the district court correctly reasoned that Shanklin's vegetation claim is not preempted.

## IV. THE EVIDENTIARY HOLDINGS

Norfolk asserts that the district court erred in admitting three pieces of evidence: the FWHA Handbook, the PSC policy, and the deposition testimony of Norfolk's CEO. This Court finds that the district court did not abuse its discretion in admitting the challenged evidence.

It is important to note that, under the abuse of discretion standard employed with respect to evidentiary rulings, the district court's decision regarding this evidence should remain undisturbed unless this panel is left with the definite and firm conviction that the district court clearly erred in its judgment after weighing the relevant factors, improperly applied the correct law, or inappropriately used the wrong legal standard. *United States v. Haywood,* 280 F.3d 715, 720 (6th Cir. 2002).[5] The district court admitted all three pieces of

---

[5] Norfolk directs our attention to, and urges us to follow, the evidentiary rulings of Judge Johnstone in *Bryant v. Tennken R.R. Co.* (No. 00-2621-DA, W.D. Tenn.). In *Bryant,* which is a very similar case, Judge Johnstone disallowed the same pieces of evidence that Judge Todd entered into evidence in this case. However, Judge Johnstone did permit the jury to view the Handbook, instructing them that the sight distance

evidence for the specific and limited purpose of showing notice or knowledge, and restricted the evidence to its proper scope.

### 1. The FHWA Handbook and the PSC Policy

Norfolk argues that the sight distance charts and graphs in the FHWA Handbook and the PSC policy that incorporated the sight distance information from the Handbook were irrelevant to Shanklin's claims and were thus erroneously admitted.

The Federal Rules of Evidence define relevant evidence broadly as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. Under Tennessee law, juries are required to compare the degree of fault of the parties, including the reasonableness of their conduct in light of all of the circumstances. *See Eaton v. McLaine*, 891 S.W.2d 587 (Tenn. 1994). A Tennessee jury must consider: "the reasonableness of [a] party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it." *Id.* at 592. Undoubtedly, whether or not Norfolk knew of the sight distance requirements recommended by the FHWA or PSC policy is a fact of consequence in relation to the issue of notice, because if Norfolk knew that a motorist needed to see a certain number of feet in order to perceive an oncoming train, it is more likely that it recognized that overgrown vegetation for which it was responsible could impede a motorist's view

---

chart was in no way a binding regulation. Two judges, certainly exercising reasonable minds, can reach opposite conclusions about the same evidence without either abusing his or her discretion so long as neither court clearly erred in its application of correct law or its invocation of incorrect law. *See In re M.J. Waterman & Assocs., Inc.,* 227 F.3d 604, 608 n.3 (6th Cir. 2000).

and cause a hazard. Indeed, it was undisputed at trial that the sight distance information from the Handbook was included in the minutes of the Norfolk Southern Tennessee Division Grade Crossing Safety Committee, and also that the sight distance information from the Handbook was incorporated into the PSC policy that was discussed with Norfolk Southern employees in Tennessee prior to the collision at issue.[6]

Because the sight distance information in the Handbook, and as incorporated into the PSC policy, helps to illuminate the notice issue, and because the district court specifically instructed the jury that neither established a legal standard, this evidence was properly admitted.[7]

### 2. Goode's Deposition Testimony

Norfolk objects to the introduction of video deposition testimony given by David Goode, the Chief Executive Officer of Norfolk. The testimony was taken in connection with *Lohman v. Norfolk & Western Ry. Co.* on August 25, 1995, and concerned a grade crossing accident in Missouri. Norfolk

---

[6] Contrary to Norfolk's argument, Judge Todd did not admit the policy as a valid regulatory exercise of the PSC, but only as an unofficial policy lacking in any legal force, but nonetheless a recommendation from the PSC of which the railroad was aware. Judge Todd warned the jury in his instructions that the policy carried no legal weight.

[7] While the material contained in the Handbook could not have been admitted for the purpose of establishing Norfolk's duty toward motorists, it was useful for the limited purpose of establishing notice. Courts and commentators have recognized that it is preferable to admit a relevant document for a limited purpose with appropriate instructions, rather than exclude admissible evidence altogether. *See Weinstein's Federal Evidence* § 105.03 [1] and [3] (Matthew Bender 2d Ed. 1997)("Total exclusion of evidence of mixed admissibility in jury cases would hardly be appropriate, since its exclusion might well deny the jury access to facts that are essential to reaching a reasonably accurate decision").

argues that the portions of Goode's video deposition testimony admitted at trial were irrelevant and unduly prejudicial. Furthermore, Norfolk asserts that the testimony cannot properly be admitted as an admission of a party opponent because the case in which the deposition was taken and the current matter do not share the same identity of issues.

This Court must first examine whether Goode's deposition testimony, taken in connection with an earlier trial, can be entered as evidence in a subsequent trial. Federal Rule of Procedure 32(a) permits the use of "any part or all of a deposition, so far as admissible under the rules of evidence . . . against any party who was present or represented at the taking of the deposition." *Id.* The Rule further states that the "deposition of a party . . . who at the time of taking the deposition was an officer . . . designated . . . to testify on behalf of a . . . private corporation . . . may be used by an adverse party *for any purpose,*" so long as it complies with the rules of evidence. Fed. R. Civ. Proc. 32(a)(2)(emphasis added). Goode's video deposition testimony does comply with the rules of evidence, either as an admission of a party-opponent under Federal Rule of Evidence 801, or as an exception to the hearsay rule under Rule 804.

Under Rule 801(d)(2), a statement can be characterized as an admission of a party-opponent, and as such, non-hearsay, when: "The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(C)-(D). Norfolk does not dispute that Goode was its president and CEO at the time of his deposition, or that he was authorized to make the statements he made during that deposition. Therefore, Goode's video deposition testimony with respect to the

*Lohman* case qualifies as a non-hearsay party-opponent admission.

Alternatively, Rule of Evidence 804(b)(1) carves out an exception to the hearsay prohibition when a witness is unavailable for testimony; it permits the inclusion of a statement given by a witness in another proceeding so long as the party "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). The Advisory Committee Notes remark that common law required the previous deposition to have a "substantial" identity of issues. Fed. R. Evid. 804(b)(1), Advisory Committee Notes. Norfolk argues here that the *Lohman* case, and Goode's deposition therein, did not involve substantially the same issues as those confronted herein. While it is true that Goode's deposition covers a crossing grade accident in another state and under different conditions, it also addresses grade crossing safety issues generally. Furthermore, Shanklin sought to introduce the testimony to prove that Norfolk was aware of the danger at grade crossings, a topic which Goode did cover in the deposition. As Norfolk's general knowledge and treatment of grade crossing dangers was likewise germane in *Lohman*, Goode and his attorneys had an opportunity and a nearly identical motive to develop Goode's testimony in the earlier case.

Second, the relevance of Goode's testimony must be assessed. Similar to the Handbook and the PSC policy, Goode's deposition presents facts of consequence with regard to Norfolk's knowledge of the dangers of grade crossings. All of Goode's deposition testimony introduced during the trial of this case related to the fact that Norfolk recognized the importance of identifying and eliminating hazardous conditions at its grade crossings prior to the collision at issue in this case. Thus the district court cannot be said to have abused its discretion in admitting Goode's testimony for the limited purpose of showing knowledge.

Third, this Court must determine whether Goode's testimony should have been excluded under Federal Rule of Evidence 403 as more prejudicial than probative. While there is nothing unfairly prejudicial about Goode's testimony regarding Norfolk's notice of issues attendant to grade crossing safety, the evidence that Norfolk had the highest grade crossing accident rate in the country was extremely prejudicial.[8] This testimony was erroneously shown to the jury, as the district court had already ruled it inadmissable. The district court immediately responded by striking the evidence and issuing the following curative instruction as requested by Norfolk:

THE COURT: Ladies and Gentlemen, during the recess, we spent the better part of an hour ruling on objections, taking things out of the deposition that weren't relevant or weren't admissible under the rules of procedure. Through an oversight, one small bit of information got into the deposition that should have been deleted but was not. The only way to cure it at this point is for me to tell you to disregard that last minute or so of the deposition you just saw and the memorandum that was showed to you on the screen. And any reference to it or any testimony about it, you'll disregard it. And if you don't remember what it was, that's good because you don't have to forget it then.

J.A. at 342-43. Even where evidence is erroneously admitted, the striking of evidence combined with instructions to the jury to disregard the evidence will usually cure the error, unless the evidence is so prejudicial that a new trial must be granted.

---

[8]During the play-back of Goode's video deposition testimony, a portion that should have been redacted was shown to jurors. In that portion of testimony, Goode's closed-captioned statement showing across the bottom of the screen indicated that Norfolk had the highest rate of grade crossing accidents in the industry.

*United States v. Ursery,* 109 F.3d 1129, 1133 (6th Cir. 1997). Notwithstanding the undoubtedly prejudicial nature of the erroneously admitted information, this Court must assume that the jury in this case followed the instruction given it by the court. *See Richardson v. Marsh,* 481 U.S. 200, 211 (1987). Therefore this Court finds the district court did not abuse its discretion in admitting Goode's video deposition testimony. No unfair prejudice resulted to Norfolk as a result of Goode's testimony regarding safety measures in general, and with respect to the erroneously admitted evidence, the district court properly responded to the mistake such that the prejudice to Norfolk was minimized.

## V. THE TENNESSEE TREE CUTTING STATUTE

Norfolk further contends that the district court erred in permitting the jury to consider Tenn. Code Ann. § 65-6-132,[9] which prohibits, on railroad's rights of way, the presence of vegetation six or more inches in diameter and "of sufficient height to reach the roadbed if they should fall."[10] *Id.* Norfolk argues that the statute should not have been considered by the jury because it was not designed to protect motorists and is obsolete. This Court finds that the district court's decision to

---

[9]Tenn. Code Ann. § 65-6-132: Trees, Removal (a) Every company or person operating a railroad in this state shall cut down all trees standing on its lands which are six (6) or more inches in diameter, two feet (2') above the ground, and of sufficient height to reach the roadbed if they should fall. (b) A failure to comply with subsection (a) will render the company liable for damages to person or property resulting therefrom . . .

[10]In her complaint, Shanklin alleged that Norfolk violated Tenn. Code Ann. § 65-6-132 with respect to the Oakwood Church Road railroad crossing, and at trial introduced evidence that there were numerous trees on Norfolk's right of way that fit within the proscriptions of the statute.

read the Tennessee statute to the jury did not constitute reversible error.

Under Tennessee law, actions for failure to comply with statutory duties are limited in scope. The Plaintiff must prove that she is the intended beneficiary of a statute before that statute can be used to establish a duty on the part of Defendant. *See Bivin v. S. Oil Serv., Inc.,* 394 S.W.2d 141, 148 (Tenn. Ct. App. 1965). Thus Norfolk initially argues that the statute, which the Tennessee legislature adopted in 1870, does not apply because it is supposed to protect train passengers from derailments caused by stray tree branches on the tracks, not motorists.

In determining whether or not Tenn. Code Ann. § 65-6-132 was meant to protect against the harm suffered by Eddie Shanklin, whose vision of the railroad crossing was found to have been obscured by overgrown vegetation present on Norfolk's right of way, we begin with the plain language of the statute. Here said language does not provide a definitive answer. The phrase "reach the roadbed if they fall," *id.,* implies that the main purpose of the statute is to protect against train derailments by ensuring that railroads keep their tracks clear of branches. However, the statute also states that a failure to comply will result in liability "for all damages to person or property" resulting therefrom. *Id.* There is indeed nothing in the language of the statute itself to indicate that its application is limited to the protection of train passengers. *See* Tenn. Code Ann. § 65-6-132. The statute's broad imposition of liability indicates that the vegetation prohibition was intended to protect against any number of harms that could result from its presence in an overgrown state.

The legislative history fails to provide any additional insight. The statute was originally passed in 1870 before the invention of the automobile; however the Tennessee legislature retained the statute in 1932 without significant

comment, after the advent of the automobile.[11] Therefore, while it cannot be said that Tenn. Code Ann. § 65-6-132 clearly applies to protect against the type of harm here at issue, neither can it clearly be held otherwise.[12]

Even if Norfolk could craft a colorable argument that Eddie Shanklin was not an intended beneficiary of this statute, and thus that the district court clearly erred in instructing the jury to consider Norfolk's negligence under Tenn. Code Ann. § 65-6-132, the error is harmless. When an error made by the court does not prejudice the outcome, the error does not justify reversal. *See Toth v. Grand Trunk R.R. Co.,* 306 F.3d 335, 348 (6th Cir. 2002). Even without consideration of Norfolk's liability under the tree cutting statute, there was

---

[11] Additionally, there is some case law and legislative evidence indicating that, even in the 1870's, both the courts and the Tennessee legislature were concerned that there be proper sight distance at railroad crossings for persons traveling on horseback or in horse drawn wagons. *See generally, Continental Improvement Co. v. Stead*, 95 U.S. 161, 162 (1877); *Grand Trunk Ry. Co. v. Ives,* 144 U.S. 408, 410 (1892); *Louisville & Nashville R.R. Co. v. Gardner,* 1 Tenn. 688 (Tenn. 1878). Further, the fact that the Tennessee legislature adopted the Railroad Precautions Act in 1856, which required train crews to maintain a lookout ahead and sound the locomotive horn during their approach to public grade crossings, indicates concern about potential hazards to those traversing grade crossings at least fourteen (14) years prior to its passage of Tenn. Code Ann. § 65-6-132 in 1870. *See generally, Railroad Precautions Act-Effect of 1959 Amendment*, 28 Tenn. Law Rev. 437 (1961).

[12] Norfolk further argues that the panel should hold that the statute is implicitly repealed because changed circumstances and non-enforcement have rendered it obsolete. Tenn. Code Ann. § 65-6-132 was passed by the Tennessee General Assembly in 1870, and as Norfolk points out, mass production of the automobile did not begin until almost forty (40) years later. Appellant's Br. at 42. The district court rejected Norfolk's argument on this issue, pointing out that the statute has been modified since the proliferation of automobiles. The district court's holding on this matter cannot be said to have been in error.

considerable evidence upon which the jury could conclude that Norfolk was liable in part for Eddie's death.

## VI. THE SUFFICIENCY OF THE EVIDENCE

Lastly, Norfolk argues that because Eddie Shanklin was the sole cause of the accident, the district court erred in denying Norfolk's Rule 50(b) Motion for a Judgment as a Matter of Law. We review Rule 50(b) motions *de novo*. *K&T Enterprises, Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir. 1996). When a Rule 50(b) motion is premised on a challenge to the sufficiency of the evidence, we apply the standard of review employed by the courts of the state whose substantive law controls the action, Tennessee in this instance. *Morales v. Am. Honda Motor Co.,* 151 F.3d 500, 506 (6th Cir. 1998). In undertaking this review, "it is not the office of an appellate court to weigh the evidence. Rather, it must take the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary." *Williams v. Brown,* 860 S.W.2d 854, 857 (Tenn. 1993). A motion for judgment as a matter of law is proper only if, after assessing all the evidence in the manner described, the court can determine that reasonable minds could not differ as to the conclusion to be drawn from the evidence. *Eaton v. McClain,* 891 S.W.2d 587, 590 (Tenn. 1994). Additionally, an appellate court is not permitted to reallocate fault in contravention of a jury verdict, even if the reviewing court disagrees with that apportionment. *Turner v. Jordan,* 957 S.W.2d 815, 824 (Tenn. 1997).

In order to bring a successful negligence claim under Tennessee law, a plaintiff must show (1) a duty of care owed to the plaintiff by the defendant and (2) a breach of that duty, which in fact and proximately causes an injury or loss. *Staples v. CBL & Associates, Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000). A risk is "unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of

harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id.* (quotation omitted). In Tennessee, a plaintiff may recover even if he or she contributes to the negligence, so long as the plaintiff's negligence remains less than the defendant's. *McIntyre v. Ballentine,* 833 S.W.2d 52, 57 (Tenn. 1992). Juries, in their allocation of fault, are to consider, among other factors, the reasonableness of the party's conduct in confronting the risk, such as whether the party knew, or should have known, of the risk. *Eaton,* 891 S.W.2d at 592.

There is evidence of Norfolk's negligence such that reasonable minds could reach differing conclusions about Norfolk's liability. The Handbook and PSC policy, while not legally requiring Norfolk to take any action, made Norfolk aware of the danger of reduced sight lines and of the sight distances needed to ensure that motorists could see oncoming trains at grade crossings. There is also evidence showing that Norfolk failed to clear vegetation near the track, and that Eddie Shanklin's sight view of the oncoming train could have been impeded thereby.[13] Given the extreme and inevitable

---

[13] With regard to Norfolk's negligence, the district court summarized the evidence introduced at trial as follows:

> An eyewitness to the accident testified that he was traveling alongside the train in his vehicle, and heard the horn blow for approximately 11 seconds from the crossing, which is less than the 1,320 feet required by Tennessee law. *See* Tenn. Code Ann. § 65-12-108(2) . . . There is also evidence in the record that the railroad's officials were aware of general studies regarding recommended sight distance for motorists at railroad crossings, even though the railroad was not required to comply with those recommendations. There is evidence that the railroad had the ability, and the authority, to make further efforts to clear vegetation and trees on its right-of-way at the crossing, but did not

injury that could result from a train-on-car collision, a jury could easily conclude that the foreseeable probability and gravity of harm outweighed the burden of clearing the vegetation on Norfolk's right of way. Reasonable minds could also reach different conclusions about whether Norfolk breached that duty and whether the breach caused Eddie's death.[14]

## VII.  CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.

---

do so.
Apx. pp. 84-85.

[14]Norfolk further argues that Eddie Shanklin was the sole cause of the accident. As its chief support for this proposition, Norfolk claims that Eddie violated Tenn. Code Ann. § 55-8-145(a)(3)-(4), which requires motorists to stop within fifty feet, but not less than fifteen feet from the near rail of the track when a train emits a signal audible from 1,500 feet away and is plainly visible to a motorist approach the crossing. The evidence presented at trial conflicted regarding whether the train sounded its whistle at the proper distance and whether Eddie heard the signal, and a reasonable jury could conclude that he did not. Furthermore, the jury did reduce Eddie's damage award by 28% for his contribution to the accident.

---

## CONCURRENCE

---

ROGERS, Circuit Judge, concurring. I concur in the majority opinion except for Part V. In my view, a plain reading of Tennessee's tree cutting statute, Tennessee Annotated Code § 65-6-132, clearly indicates that the sole purpose of the statute was to prevent trees from falling onto the tracks. I concur not because Mr. Shanklin was within the protected class of the statute, but because the tree cutting statute was nonetheless admissible as evidence because it was relevant, though not controlling, on the negligence determination under Tennessee law.

Tennessee Annotated Code § 65-6-132 states:

(a) Every company or person operating a railroad in this state shall cut down all trees standing on its lands which are six (6) or more inches in a diameter two feet (2') above the ground *and of sufficient height to reach the roadbed if they should fall.*

(b) *A failure to comply with subsection (a) will render the company liable for all damages to person or property resulting therefrom*; also to a penalty of one hundred dollars ($100), to be recovered on suit brought in the name of any citizen before any tribunal having jurisdiction, one half ( 1/2 ) of which shall go to the treasury of the county in which said provisions may have been disregarded, and the other one half ( 1/2 ) to the plaintiff.

(emphasis added). Subsection (a) of § 65-6-132 is obviously concerned with trees greater than six inches in diameter falling onto a railroad track. Although the district court believed the diameter requirement set forth in the statute

might have indicated that the Tennessee legislature was also concerned with visibility, the diameter requirement is easily explained by the fact that the thicker the trunk, the more likely a derailment would occur if the tree fell.

Because the language of the statute clearly indicates that Mr. Shanklin was not within the class that § 65-6-132 was designed to protect, the statute could not be used as a basis for liability under the statutory tort defined by subsection (b) of § 65-6-132. Similarly, the statute could not be used as a basis for negligence *per se* under Tennessee law. Under longstanding and consistently applied Tennessee law, a plaintiff must demonstrate that the injured party was "within the class of persons intended to benefit from or be protected by the statute" to recover under a theory of negligence *per se*. *Alex v. Armstrong*, 385 S.W.2d 110 (Tenn. 1964); *Carter v. Redmond*, 218 S.W. 217, 218 (Tenn. 1920); *Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 452 (Tenn. Ct. App. 1998); *Traylor v. Coburn*, 597 S.W.2d 319, 322 (Tenn. Ct. App. 1980); *Berry v. Whitworth*, 576 S.W.2d 351, 353 (Tenn. Ct. App. 1978); *see also* RESTATEMENT (SECOND) OF TORTS § 286. Thus, if the district court had instructed the jury that violation of the tree cutting statute required the jury to find negligence on the part of defendant, we would be compelled to reverse.

The district court, however, did not instruct the jury that the Norfolk Southern's failure to comply with the tree cutting statute constituted negligence per se. Instead, the district court read § 65-6-132(a) to the jury along with three other statutes relating to duties of railroad companies to keep crossing safe and the duties of a motorist when approaching a railroad crossing.[1]

---

[1]The district court did specify that the violation of Tennessee Code Annotated § 65-12-108, which relates to precautions for railroad crossings such as signs and whistles, is considered negligence per se

Tennessee law is not clear on the question of whether a statutory obligation that protects against different harms may nonetheless be considered by a jury as part of its analysis of whether the defendant violated the common law standard of care. While a number of Tennessee tort cases deal with statutes that arguably protect against different harms, the cases generally involve the question of whether violation of the statute amounts to negligence as a matter of law, not with the question of whether the factfinder could consider the statute for any purpose whatsoever.

Almost eighty-five years ago, the Tennessee Supreme Court held that a statute requiring automobile drivers to stop at railroad crossings was intended to protect against collisions between automobiles and trains, and not to protect against other traffic accidents that happen to occur at a railroad crossing. *Carter v. Redmond*, 218 S.W. 217, 218 (Tenn. 1920). The court concluded not only that the trial judge erred in giving a negligence per se instruction, but that the trial judge also erred in refusing to give a tendered instruction that the "statute had no bearing on the case before them." *Carter* appears to support the conclusion that the district court in this case should not have read the tree cutting statute to the jury, but the case is hardly on all fours. Defendant in this case did not tender a limiting instruction, although defendant did object to having the statute read to the jury. More importantly, the ultimate basis for reversal in *Carter* was the erroneous instruction regarding negligence per se, not the failure to instruct that the statute had no bearing. The *Carter* court found that the trial court's error was material because the erroneous negligence per se instruction "practically necessitated a verdict against" defendant. The statement approving the tendered instruction was arguably dictum,

---

under Tennessee Code Annotated § 65-12-109. However, the district court did not instruct that a violation of the tree cutting statute constituted negligence per se.

inasmuch as the court did not need to reach the materiality of the trial court's failure to give the tendered instruction.

In contrast, in *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799 (6th Cir. 1984) (applying Tennessee law), we reviewed a district court judgment in a case in which the district court had refused to give a negligence per se charge, but nonetheless informed the jury that the regulation in question "may be considered . . . as some evidence . . . of the (appropriate) standard of care." In *Teal* an employee of an independent contractor was injured by a ladder that allegedly did not conform to federal OSHA regulations. While permitting the jury to consider the OSHA regulation as some evidence of the appropriate standard of care, the district court refused to instruct the jury on negligence per se. On plaintiff's appeal, we reversed, holding that because the OSHA regulation was indeed intended to protect the employees of independent contractors, the district court was required to give a negligence per se instruction. Our opinion, however, did not criticize at all the district court's apparent conclusion that a regulation not intended to protect a plaintiff could nonetheless be considered as some evidence of the appropriate standard of care.

In the absence of clear Tennessee authority, we must make our best estimation of how the Tennessee Supreme Court would rule on the question of whether the Tennessee tree cutting statute could be admitted as some evidence of negligence, even though the jury could not consider it as a basis for negligence per se. Two considerations lead me to the conclusion that the answer to this question is yes.

First, the Restatement of Torts would clearly answer the question yes. Comment g to the Restatement (Second) of Torts § 286 states:

The fact that a legislative enactment requires a particular act to be done for the protection of the interests of a

particular class of individuals does not preclude the possibility that the failure to do such an act may be negligence at common law toward other classes of persons. It also does not preclude the possibility that, in a proper case, the requirements of the statute may be considered *as evidence* bearing on the reasonableness of the actor's conduct.

RESTATEMENT (SECOND) OF TORTS § 286 cmt. g (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 286 cmt. f ("The fact that a legislative enactment requires a particular act to be done for the protection of the interests of a particular class of individuals does not preclude the possibility that the doing of such an act may be negligence at common law toward other classes of persons.").

Second, it is consistent with general principles of American tort law to permit the jury to consider the Tennessee statute as some evidence of negligence. When a jury makes a negligence determination, its determination can be likened, using the famous "Hand formula," to a balancing of the burden on the defendant in acting more carefully against the probability of harm multiplied by the magnitude of harm if the defendant does not so act. *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.). In evaluating how burdensome it was to the defendant railroad to cut down the trees in question to avoid the possibility of harm to persons like Shanklin, it is relevant for the jury to know that the railroad was required to cut down the trees anyway for an entirely different purpose. Thus it makes sense, at least in the context of the instant case, for the jury to be aware of legal requirements that directly affect the balance that the jury is conceptually required to make in determining whether defendant has been negligent.

I would therefore hold that the district court in this case did not err in reading the tree cutting statute to the jury. It would of course have been preferable for the court to have stated

clearly to the jury that a violation of the statute did not necessarily mean that defendant was negligent. It would also have been better for the district court to have explained that the jury could take into account the defendant's legal obligation to minimize the risk of limbs obstructing the tracks, only as part of its evaluation of whether the defendant acted reasonably in not increasing the sight-distance for oncoming trains.

Moreover, even if it was not appropriate for the district court to read § 65-6-132 to the jury, the error was in any event harmless, again because the jury was not instructed that violation of the tree cutting statute would constitute negligence per se. *Compare Carter*, 218 S.W. at 217-19. As jurisdiction for this case is based on diversity of citizenship, "federal law governs our standard of review for determining whether a jury instruction is prejudicial." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 166 (6th Cir.1993) (internal quotation marks and citations omitted); *Teal*, 728 F.2d at 801. The Sixth Circuit has stated that it

will reverse a jury's verdict on the basis of improper instructions only when the instructions, when viewed as a whole, are confusing, misleading, and prejudicial. Federal courts generally presume the jury will follow the instructions correctly as given. We will not reverse a decision on the basis of an erroneous jury instruction where the error is harmless.

*Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000).

Although the jury was shown several dissections of trees during trial, the lack of a negligence per se instruction with regard to § 65-6-132 indicates that the jury only considered the violation of the statute as evidence of Norfolk Southern's negligence. Throughout the trial the plaintiff presented a considerable amount of other evidence as to Norfolk

Southern's duty and its breach of that duty. Thus, the simple reading of the tree cutting statute during the jury instruction, even if erroneous, was harmless.