CATES, ADMR., Appellant,

v.

CONSOLIDATED RAIL CORPORATION et al., Appellees.

[Cite as *Cates v. Consol. Rail Corp.* (1995), 100 Ohio App.3d 288.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 14432.

Decided Jan. 18, 1995.

*Steve J. Ruschau* and *Scott Rudnick,* for appellant.

*Patrick Smith,* for appellees Consolidated Rail Corporation and Grand Trunk Western Railroad.

*Neil Freund,* for appellee city of Dayton.

BROGAN, Judge.

The appellant, Luann M. Cates, appeals from the judgment of the Montgomery County Common Pleas Court wherein the court granted summary judgment to the appellees, Consolidated Rail Corp. ("CSX"), Grand Trunk Western Railroad Company, Larry Meek, and the city of Dayton.

The events surrounding the litigation occurred just before sunrise on November 7, 1991 when Cates' husband Kenneth was en route to his place of employment. Kenneth was traveling in his automobile south on North Irwin Street in Dayton at a speed of twenty-five to thirty miles per hour. The speed limit on Irwin Street was twenty-five miles per hour. As Kenneth's automobile crossed the railroad tracks, it was struck by an eastbound Grand Trunk train consisting of seventy-three separate cars traveling at twenty-five to thirty miles per hour, killing Kenneth.

Luann Cates brought suit individually and as the administrator of the estate of her late husband, contending that her husband was killed because of the negligent operation of the train by Grand Trunk and its engineer, Meek, the negligence of CSX in failing to provide adequate warning devices at the railroad crossing, and because Dayton maintained a "nuisance" at the crossing by failing to install proper warning devices.

In granting summary judgment to CSX and Grand Trunk, the trial court found that reasonable minds could only conclude that Grand Trunk fulfilled its statutory duty of sounding the train's whistle, as the plaintiff offered only negative evidence that the train failed to sound its whistle. The trial court also found that the plaintiff failed to present any evidence that Grand Trunk had not properly

illuminated its train engine with the proper headlight as required by federal regulations.

The trial court also found that there was no evidence that the train was travelling at an excessive speed or that the engineer's brief glance at a pickup truck which had just cleared the track before Kenneth's vehicle contributed in any way to the accident.

The trial court found that since evidence was presented that at a point seventy-five feet north of the track, the train was plainly visible to Kenneth, he could have avoided the accident by using ordinary care, since there was nothing at the crossing that could have prevented him from seeing or hearing the train in time to stop before reaching the track. The trial court therefore found as a matter of law that the crossing was not extrahazardous.

The trial court granted summary judgment for Dayton because the court found the city had complied with the signage mandates of the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), and had no duty to install active devices, such as flashers and gates. In any event, the decision concerning the need for such devices involves "policy making powers" for which the city enjoyed immunity.

The evidence fairly established that Irwin Street meets the railroad track at a ninety-degree angle and a yellow and black round railroad warning device was located two hundred forty feet north of the track and the statutory white and black crossbuck railroad sign was installed on the east side of the street twenty-eight feet north of the track.

After the accident, Detective Greg Jackson of the Dayton Police Department determined that the train's headlights were on and the train's horn was working properly.

The train engineer, Larry Meek, testified in a deposition that as the train approached the Irwin Street intersection at a speed of twenty-five to thirty miles per hour he sounded the train's whistle and rang the bell continuously. He said about three hundred feet from the intersection he observed a small white pickup truck speed across the crossing in front of him. He said he glanced at the pickup truck momentarily and then struck Kenneth Cates' vehicle. He said he did not see Kenneth's vehicle before the collision.

Dexter Little, Jr. stated in his affidavit that just prior to the accident he was driving just behind Kenneth's vehicle on his way to work. He said he was driving twenty-five to thirty m.p.h. with his driver's side window partially open and he saw the train collide with Kenneth's automobile, which was only several seconds in front of his car. Little said he did not hear a train whistle blow at any time

prior to the collision. He also said he neither saw the train nor a light from the train prior to the accident.

Robert Hunt was working as a security guard for Duriron, Inc. located near the crossing on the side from which the decedent attempted to cross. From inside an enclosed guard shack located at the crossing Hunt testified he first heard the train whistle when the train was well west of Irwin Street. He said he heard the train's whistle as it passed the guard shack. He said he did not believe the train's horn was as loud as usual.

In 1984, the North Irwin Street railroad crossing was evaluated by the Dayton Bureau of Traffic Engineering for the purpose of determining whether additional train warning devices were necessary. In the judgment of Dayton Traffic Engineer Charles DeArmon, who conducted the study, additional warning devices were warranted. CSX received a written notice from the Ohio Department of Transportation that the Irwin Street/CSX crossing was designated by ODOT to receive flashers and gates. CSX commenced its preliminary engineering studies at ODOT's request.

A recommendation and consent legislation for improved protection at this crossing was made to the city commission. However, Dayton never passed the required legislation.

On January 25, 1985, ODOT requested CSX to put the project "on hold" because Dayton had not passed the required consent legislation. After not hearing further from ODOT as to the project's status, CSX contacted ODOT on June 23, 1987 and was advised that Dayton would not agree to pass the consent legislation to allow the project to proceed. On January 16, 1989, CSX again called ODOT to stop work on the project and close it out because Dayton had not passed the required legislation.

On June 5, 1989, ODOT conducted a diagnostic engineering survey of the grade crossing involved in this accident and recommended the installation of automatic train activated flashers and gates at both crossings. CSX participated in the ODOT's diagnostic team engineering study.

Dayton was requested to sign consent legislation to permit the installation of advance-warning devices. The Dayton Engineering Department chose not to present the necessary legislation to the city commission because of the low volume of trains each day at the crossing and only minor accidents were reported over a twenty-year period. The project calling for the installation of automatic light signals and roadway gates was canceled. This project was one hundred percent federally funded.

On July 17, 1992, recommendations were made by the Acting City Engineer to the Acting City Manager that the city proceed with the consent legislation.

Thereafter, plans were made to start the construction of flashing light signals and roadway gates at the Irwin Street crossing.

In opposition to the respective motions, appellant provided the affidavit of Dr. William Berg, a licensed professional engineer specializing in highway-grade crossing safety. Dr. Berg stated the following pertinent information in his affidavit:

"1) The subject grade crossing of the Conrail/CSX tracks with Irwin Street was extra hazardous based on conditions existing as of 1990. Both the predicted and actual accident rate at the crossing placed it among the most hazardous grade crossings found anywhere in the United States. The Irwin Street crossing was about 10–13 times more hazardous than the average railroad crossing.

"2) For a motorist to have a reasonable opportunity to detect and avoid a collision with a train at a grade crossing where no automatic warning devices exist, there must be adequate sight distance. Sight distance at the Irwin Street grade crossing is substantially obscured due to the presence of buildings. The consequence of this failure to meet minimum accepted sight distance standards is that some motorists will not be able to detect a train that is in hazardous proximity at a point in time where they still have an adequate distance within which to bring their vehicle to a safe stop. Standard countermeasures for this type of deficiency are to install STOP signs or automatic warning devices, or alternatively to reduce train speeds so as to meet the sight distance requirements.

"3) Other factors which further add to the hazard at the crossing are: a) the presence of two main tracks where one train can obscure the approach of a second train; b) a spacing between main tracks which will not permit a large truck to safely stop between the two tracks; and c) a rough crossing surface caused by humps in the roadway profile which creates a distraction to motorists and reduces their ability to simultaneously look for trains.

"4) Based on the above factors, the subject grade crossing required automatic gates to provide a reasonable level of safety to the motoring public. These devices would have compensated for the noted deficiencies. Without these devices, reasonably prudent motorists would continue to be unnecessarily involved in vehicle-train accidents with a resultant high probability of serious injury or death.

" * * *

"6) A reconstruction of the time-space relationships associated with the subject accident indicated that Mr. Cates *only had about 1.6 sec* within which to perceive and react to the subject train due to view obstructions and the very limited effectiveness of the train headlights which are not designed as warning lights for

motorists. This amount of warning time is insufficient to afford the average motorist a reasonable opportunity to successfully detect and avoid a train. * * * [Emphasis *sic.*]

"7) Mr. Cates' collision with the CSX train was a result of a delayed detection of the presence of the train caused by: a) conflicting information presented by the fact that the vehicle a short distance ahead of him did not slow or stop for the approaching train; b) view obstructions created by the buildings located in the northwest quadrant of the crossing; and c) poor train target value due to the lack of a flashing strobe light and the inherent limited audibility of the train horn.

" * * *

"9) The Motion of Defendants Grand Trunk Western Railroad Company and Larry D. Meek for Summary Judgment contains a number of inaccuracies and/or misstatements of fact regarding actual policies and practices in the field of grade crossing safety. These are summarized below.

"a) The assertion that because the train headlight was on, the train was therefore clearly visible is a misstatement of fact * * *. A headlight cannot be seen through a building. Moreover, headlights are not designed to alert or warn motorists, although they can have that effect under certain conditions. Train headlights are only designed to illuminate the track ahead of the train so that the crew can better detect hazards. The railroad industry does use flashing warning lights on locomotives whose sole purpose is to warn motorists. These are commonly referred to as strobe lights or oscillating headlights.

"b) The FRA maximum authorized train speed has nothing to do with grade crossing safety * * *. Railroads regularly set their own speed restrictions below the FRA maximum permitted speed as published in their timetables and bulletins. The Easterwood decision did note that train speed was a relevant factor in judging whether a crossing was unreasonably hazardous.

"c) [Kenneth] Cates was only required to stop at the crossing if he detected a train and judged it to be in hazardous proximity * * *. Obviously, if a motorist's view is obstructed and the train horn is not loud enough to be heard, a motorist is not being provided with a reasonable opportunity to comply with the law. Moreover, the assertion further contradicts what the statute clearly states in that there is no requirement that a motorist who does stop remain stopped until the train passes.

"d) The crossbuck is not equivalent to a yield sign or a stop sign.

"e) Suggesting that a motorist involved in a collision with a train must not have looked and listened effectively is a misstatement of engineering and human factors knowledge of driver behavior * * *. It is well known that reasonable looking and listening patterns are often insufficient to afford a reasonable level of

safety. This is the fundamental basis for installation of automatic warning devices. Whatever the task, there can be prevailing conditions which preclude successful human performance, regardless of the diligence of the person.

"f) The assertion that a view obstruction does not relieve the driver of the duty to stop and yield to a train * * * ignores the fact that the view obstruction may make compliance with the law impossible. A crossbuck is not a STOP sign. The motorist must only stop if a train is detected in hazardous proximity. A train that is in hazardous proximity, but which cannot be seen or heard at a point which would permit a safe stop, is a situation that deprives the motorist of a reasonable opportunity to comply with the law.

"g) The assertion that a driver who approaches a crossing at a speed which does not permit a stop is negligent * * * ignores the fact that the only speed which would permit such a stop is zero miles per hour. At any non-zero speed, there is always a distance ahead of a vehicle within which the vehicle cannot be brought to a stop. Thus to accept this assertion is to define the crossbuck as a STOP sign, which it clearly is not according to the Manual on Uniform Traffic Control Devices. STOP signs themselves are specifically permitted at rail-highway crossings. This would be totally unnecessary if the original assertion were true."

■ The trial court appropriately granted summary judgment to Dayton. The evidence was uncontroverted that the city complied with the mandates of the Uniform Manual of Traffic Control Devices. The manual requires street markings only if there are gates and flashers and the prevailing speed limit is forty m.p.h. or greater.

The city cannot be liable upon a claim of nuisance for failing to erect active warning devices at the crossing. The manual did not require the presence of these warning devices. The decision to permit their installation involved engineering judgment and was a discretionary decision for the city. Where the installation of these devices is discretionary pursuant to the manual, the municipality is immune from tort liability for damages allegedly resulting from the absence of such devices. *Winwood v. Dayton* (1988), 37 Ohio St.3d 282, 525 N.E.2d 808; see, also, *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 632 N.E.2d 502.

The appellant filed separate appellate briefs as to each appellee. In the first assignment in her brief directed to appellee, CSX, she contends the trial court erred in holding as a matter of law that the railroad crossing was not extrahazardous.

In *Matkovich v. Penn Cent. Transp. Co.* (1982), 69 Ohio St.2d 210, 23 O.O.3d 224, 431 N.E.2d 652, the Ohio Supreme Court held that a railroad has a duty of ordinary care to protect the safety of motorists.

■ Both a motorist and a train owe each other a duty of care to avoid collisions. *Barger v. Chesapeake & Ohio Ry. Co.* (1990), 70 Ohio App.3d 307, 590 N.E.2d 1369. The motorist's duty has been codified in R.C. 4511.62, which provides, in pertinent part:

"(A) Whenever any person driving a vehicle or trackless trolley approaches a railroad grade crossing under any of the circumstances stated in this section, he shall stop within fifty feet but not less than fifteen feet from the nearest rail of the railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:

" * * *

"(4) A train approaching within approximately one thousand five hundred feet of the highway crossing emits a signal audible from that distance and the train, by reason of its speed or nearness to the crossing, is an immediate hazard;

"(5) An approaching train is plainly visible and is in hazardous proximity to the crossing."

■ In *Zuments v. Baltimore & Ohio RR. Co.* (1971), 27 Ohio St.2d 71, 72, 56 O.O.2d 40, 41, 271 N.E.2d 813, 814, the Supreme Court elaborated on a motorist's duty when a railroad crossing is approached and stated:

"The driver of a motor vehicle about to pass over a railroad grade crossing on a public highway is required both to look and to listen for approaching trains, and the looking and listening must be at such time and place and in such manner as to be effective for that purpose. Where the uncontrovertible physical facts demonstrate that plaintiff's decedent did not so do, then such failure on his part was a proximate cause of the collision as a matter of law. * * *"

The uncontroverted evidence is that Kenneth Cates drove his vehicle across the railroad crossing without stopping to look or listen for the presence of an oncoming train. Had he done so he could not have failed to have seen the train which collided with his vehicle. As such he violated R.C. 4511.62 and was negligent as a matter of law.

■ Where the view of the traveler approaching a railroad crossing is obstructed, such circumstances make necessary the use of greater precaution on his part and render his neglect to look or listen all the more culpable. *North v. Pennsylvania Rd. Co.* (1967), 9 Ohio St.2d 169, 38 O.O.2d 410, 224 N.E.2d 757; *Stormont v. New York Cent. Rd. Co.* (1964), 1 Ohio App.2d 414, 30 O.O.2d 413, 205 N.E.2d 74; *Osborn v. Norfolk & W. Ry. Co.* (1990), 68 Ohio App.3d 85, 587 N.E.2d 433.

Kenneth Cates' negligence does not automatically bar his claim, however. If there is also evidence that the appellee, CSX, was negligent, then there may be grounds for submitting the case to the jury.

 A railroad is under no duty to provide extrastatutory warnings at a grade crossing, where such warnings are not required by any order of the Public Utilities Commission, if there is no substantial risk that a driver in the exercise of ordinary care may be unable to avoid colliding with a train that is being operated over the crossing in compliance with statutory requirements. *Hood v. New York, Chicago & St. Louis RR. Co.* (1957), 166 Ohio St. 529, 3 O.O.2d 12, 144 N.E.2d 104.

In *Hood,* the Supreme Court noted that the Public Utilities Commission of Ohio has authority under R.C. 4907.47 to order a railroad to install automatic traffic control devices, and that without such an order, the railroad's only statutory duty is to install the crossbucks required by R.C. 4955.33, in order to "give notice of the proximity of the railroad and warn persons to be on the lookout for the locomotive."

The court further recognized that while *every crossing is dangerous,* only where a crossing is "unusually dangerous" or "extrahazardous," may a railroad be required "in the exercise of ordinary care" to take additional steps to warn:

"However, although almost every railroad grade crossing involves a substantial risk of danger to those using the highway over such crossing, those decisions [by this court] have definitely recognized that *something well beyond the usual substantial risk of danger* at a railroad grade crossing *must exist before a jury can be permitted to determine* that a railroad should have provided extra statutory warnings at such crossing, where they have not been required by an order of the Public Utilities Commission." (Emphasis added.) *Hood,* 166 Ohio St. at 534–535, 3 O.O.2d at 15, 144 N.E.2d at 108.

The court then defined, in paragraph six of the syllabus, the "extrahazardous crossing" in order to evenly balance the rights and duties of the railroad and the motorists:

"A railroad is under *no duty* to provide extra-statutory warnings at a grade crossing, where not required to do so by an order of the Public Utilities Commission, if *there is no substantial risk that a driver in the exercise of ordinary care may be unable to avoid colliding with a train that is being operated over the crossing in compliance with statutory requirements.*" (Emphasis added.)

The court further explained this standard of due care:

"Stated another way, a railroad is *under no duty* to provide extrastatutory warnings at a grade crossing, where not required to do so by any order of the Public Utilities Commission, if there is no substantial risk that a driver in the exercise of ordinary care may be unable to avoid colliding with a train that is being operated over the crossing in compliance with statutory requirements. In determining what, in addition to compliance with statutory and commission regulations, *the exercise of ordinary care may require* of a railroad at a grade crossing, *the railroad should be able to assume that those who drive over the railroad's 'right of way' at that crossing will do so in the exercise of ordinary care.*" (Emphasis added.) *Hood*, 166 Ohio St. at 535, 3 O.O.2d at 16, 144 N.E.2d at 109.

The court in *Hood* held it was error for the trial court to permit the jury to consider whether the defendant was under a duty to provide any extrastatutory warnings. The court stated:

"Admittedly, at all times after reaching a point within 20 feet of the rails, the driver of that car had a clear and unobstructed view to the east. If there was a light in front of the oncoming train or if its bell was ringing or its whistle blowing, that driver, *in the exercise of ordinary care*, should have avoided the collision." (Emphasis added.) *Hood*, 166 Ohio St. at 536, 3 O.O.2d at 16, 144 N.E.2d at 109.

■ The facts in this case are undisputed that a place seventy-five feet north of the railroad track Kenneth Cates had a clear, unobstructed view of the tracks and by using ordinary care could have avoided the accident. There is also no evidence that the Public Utilities Commission found the Irwin Street crossing to be so dangerous as to require additional protective devices. See *Glick v. Marler* (1992), 82 Ohio App.3d 752, 613 N.E.2d 254; and *Cox v. Consol. Rail Corp.* (Aug. 28, 1984), Butler App. No. CA89-02-030, 1989 WL 99314, unreported. The appellant's first assignment of error is overruled.

■ In light of our resolution of the first assignment, appellant's fourth assignment of error must also be overruled. If CSX was not negligent as a matter of law in failing to install the additional protective devices, it was, *a fortiori*, not guilty of wilful and wanton conduct.

■ In her second and third assignments of error, the appellant contends the trial court erred in awarding summary judgment on the basis that appellee CSX was prohibited from installing traffic control devices, railroad signs, or signals without approval of Dayton. Having determined that the appellee had no duty to install the automatic gates and flashes at the Irwin Street crossing, any error in the court's interpretation of the authority of CSX to install these devices is harmless.

Having determined that Kenneth Cates was negligent as a matter of law, the appellant's fifth assignment is likewise overruled.

■ In appellant's first assignment of error relating to appellees Grand Trunk and Larry Meek, the appellant contends the trial court erred as a matter of law in determining that there was no factual dispute that Larry Meek sounded the train's whistle as required by R.C. 4955.32.

That section provides in pertinent part:

"Every company shall attach to each locomotive engine passing upon its railroad a bell of the ordinary size in use on such engines and a steam or compressed air whistle. When an engine in motion and approaching a turnpike, highway, or street crossing or private crossing where the view of such crossing is obstructed by embankment, trees, curve, or other obstruction to view, * * * the engineer or person in charge of such engine shall sound such whistle at a distance of at least eighty and not f[a]rther than one hundred rods from such crossing and ring such bell continuously until the engine passes the crossing."

Although Larry Meek testified he sounded the train's whistle as required by law, Robert Hunt could not recall whether the engineer continued to blow the train's whistle to the point of impact. Dexter Little, Jr. testified he did not hear the train whistle blow at any time prior to the collision, even though his car window was partially open at the time.

In *Hood, supra*, the court held at the syllabus that where the driver of an automobile testifies that he looked and listened for a train at a place where such driver should have been able to hear a bell and whistle of and see a headlight on an approaching train, his negative testimony that he heard no bell or whistle and saw no headlight must be given some weight, notwithstanding positive testimony that the bell was rung, the whistle was blown, and the headlight was on.

Such negative testimony has probative value if given by witnesses who were in position to know or hear. *Hicks v. Baltimore & Ohio RR. Co.* (1953), 160 Ohio St. 307, 52 O.O. 202, 116 N.E.2d 307. See, also, *Ernst v. Baltimore & Ohio RR. Co.* (C.A.6, 1963), 316 F.2d 856, and *Strahm v. B & O RR. Co.* (1972), 32 Ohio App.2d 333, 61 O.O.2d 508, 291 N.E.2d 783. The appellant's first assignment as to these appellees is sustained.

■ In her second assignment of error, appellant contends the trial court erred in holding as a matter of law that the train's headlight was discernible as a matter of law.

In support of this assignment, the appellant notes that Dexter Little, Jr. did not recall seeing a light emanating from the train prior to the collision. The appellant also argues that Section 115.05 of the Dayton Codified Ordinances

provides that a light of sufficient brilliancy to notify persons of the approach of the locomotive shall be placed upon the end of the locomotive toward the direction it is being run.

The appellees, for their part, argue that federal regulations preempt the city ordinance to the contrary. That regulation is Section 229.127, Title 49, C.F.R., and it provides:

"(a) Each lead locomotive used in road service shall have a headlight that produces at least 200,000 candela. Each headlight shall be arranged to illuminate a person at least 800 feet ahead and in front of the headlight."

The Ninth Circuit in *Marshall v. Burlington N., Inc.* (C.A.9, 1983), 720 F.2d 1149, held that the subject of proper warning equipment to be used on locomotives has been preempted by federal statutes and regulations and a railroad cannot be held liable for failing to have other equipment such as strobes or oscillating lights. We find that opinion persuasive. We find that a jury issue exists as to whether the train locomotive's light was on at the time of the accident. The light was required to illuminate eight hundred feet of the track in front of the train and Dexter Little, Jr. testified he did not see the train's light before the collision occurred. The second assignment of error is sustained in part.

███ In her third assignment, she contends the trial court erred in concluding that the engineer's looking away just before the accident would not have made the "slightest difference" in his ability to stop the train after seeing Kenneth's automobile.

The appellant agrees with the law which places upon the engineer the duty only to look out for persons or things "upon the track." *New York, Chicago & St. Louis RR. Co. v. Kistler* (1902), 66 Ohio St. 326, 64 N.E. 130, in which paragraph six of the syllabus states:

"It is the duty of a locomotive engineer to keep a lookout on the track ahead of the train. If while so doing his eye takes in a person approaching the track, he may assume that such person will keep away from the track until the train passes; but when it becomes evident that such person will not keep off the track, it becomes the duty of such engineer to use ordinary care to prevent injury to such person; his first and highest duty, however, being for the safety of the passengers and property of his charge for transportation."

The court added, referring to the engineer:

"His duty being to look ahead, it cannot be his duty to look at the same time to the sides." *Id.* at 337, 64 N.E. at 133.

It is not negligent for the engineer and brakeman for a railroad locomotive to assume that an automobile approaching the tracks will yield to the oncoming train. If engineer Meek had focused his attention completely on the tracks ahead of him he would have seen only the victim's car on the track for an instant. We cannot, however, say that application of the train's brake and the resultant slackening of speed would not have averted the accident as a matter of law. See *Knaff v. New York Cent. RR. Co.* (1949), 55 Ohio Law Abs. 193, 199, 86 N.E.2d 814. The appellant's third assignment is sustained.

In her fourth assignment, the appellant contends the trial court erred in holding that appellee Meek was operating his train at a safe rate of speed. Regulations adopted under the Federal Railroad Safety Act authorized the train's speed at sixty miles per hour. The train was travelling well under that limit. Federal regulations regarding train speed preempt a claim of common-law negligence based upon train speed. *CSX Transp., Inc. v. Easterwood* (1993), 507 U.S. ——, 113 S.Ct. 1732, 123 L.Ed.2d 387. The appellant's fourth assignment of error is overruled.

Having overruled the assignments related to the appellees CSX and Dayton, the trial court's order granting summary judgment in their favor is hereby affirmed.

We cannot say as a matter of law that Kenneth Cates' negligence in failing to exercise due care for his own safety exceeded the alleged negligence of Grand Trunk and its engineer in failing to adequately sound the train's whistle, illuminate the train, and keep a proper lookout on the railroad track. See, *e.g.,* *Barger v. Chesapeake & Ohio Ry. Co., supra,* 70 Ohio App.3d at 314, 590 N.E.2d at 1373.

The order of the trial court granting summary judgment to Grand Trunk and Meek is hereby reversed, and the cause is remanded for a trial on the merits.

*Judgment accordingly.*

WOLFF and FAIN, JJ., concur.