WOOTEN et al., Appellants,

v.

CSX RAILROAD et al., Appellees.

[Cite as *Wooten v. CSX RR.*, 164 Ohio App.3d 428, 2005-Ohio-6252.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 2005 CA 4.

Decided Nov. 23, 2005.

430

Gary J. Leppla, for appellants.

James L. O'Connell and James F. Brockman, for appellee CSX Transportation, Inc.

Steven G. Laforge and Jeffery J. Sniderman, for appellees Miami County Board of Commissioners and Douglas Christian.

Jeffery C. Turner and Boyd W. Gentry, for appellee Board of Trustees of Staunton Township.

WOLFF, Judge.

{¶ 1} Amber Wooten appeals from a judgment of the Miami County Court of Common Pleas that granted summary judgment to CSX Transportation, Inc. ("CSX"); the Board of Trustees of Staunton Township ("Staunton Township"); the Miami County Board of Commissioners and Miami County Engineer Douglas Christian (collectively, "Miami County").

{¶ 2} The following facts are undisputed.

{¶ 3} At approximately 9:30 a.m. on July 25, 2001, Amber Wooten was driving her infant daughter, Ashley, to visit the child's father. Ashley was riding in the back of Wooten's vehicle, a 2001 Chevy Cavalier. As part of her route, Wooten traveled east on Peterson Road in Staunton Township, Miami County, Ohio. Peterson Road runs east and west and is intersected by a railroad that runs north and south. The crossing was indicated by a railroad "crossbuck" sign, and a white stop bar was painted on the road beside the sign. The crossing was not equipped with active warning devices, such as flashing lights or a gate. On July 25, 2001, a field of mature corn occupied the land on the southwest quadrant of the Peterson Road intersection. The corn was approximately seven feet high.

{¶ 4} As Wooten approached the crossing from the west, a northbound train operated by CSX also approached the crossing. The train was controlled by Larry Terrell, the engineer, and Randolph Napier, the conductor, both long-time CSX employees. Terrell began blowing the train's whistle as he passed the whistle signal. When the train was approximately 100 feet south of the crossing, Terrell observed Wooten's car "come out from behind the corn field" about 25 feet west of the tracks. Wooten testified in her deposition that she had a habit of approaching train tracks at a speed of approximately 15 miles per hour and of stopping before the tracks (at approximately the stop bar) to look and listen for a train. In contrast, Terrell testified in his deposition that Wooten approached the crossing very slowly and stopped on the tracks, with a part of her car about four feet east of the westernmost rail; Wooten then looked down the line at the train. Terrell "put the train in emergency" and made an exclamation of alarm. Napier looked up and saw Wooten—her car stopped on the track—looking at the train. Terrell placed an emergency call to the CSX dispatcher.

{¶ 5} The CSX train hit the front right passenger side of Wooten's vehicle and pushed it approximately 25 feet along the track. The train traveled approximately 1,800 feet past the crossing before coming to a halt. Wooten suffered serious injuries, including severe injuries to her head and face. Ashley suffered only minor injuries.

{¶ 6} On July 17, 2003, Wooten, Ashley, and Wooten's mother, Diane Litton, brought suit against CSX, Miami County, and Staunton Township in the Miami County Court of Common Pleas, alleging several common-law negligence claims. With regard to CSX, the plaintiffs claimed that the railroad had negligently failed to (1) exercise proper caution when approaching the crossing, (2) remove obstructive vegetation, (3) install lights and gates at the crossing, and (4) reduce the train's speed due to the visually obstructive vegetation at the crossing. They further claimed that Miami County and Staunton Township breached their duty to maintain Peterson Road and keep it clear of nuisance, i.e., the obstructive vegetation.

{¶ 7} The defendants filed motions for summary judgment, which the trial court granted on February 2, 2005. The court held that Staunton Township had no duty to maintain Peterson Road, a county highway, and that Miami County's maintenance of Peterson Road did not proximately cause Wooten's injuries. The court emphasized that the corn was grown entirely on private property and did not extend into the county's right-of-way. As for CSX, the court noted that the train had been operated within its authorized speed, and it "[found] no factual support for [Wooten's] argument that even if speed has been preempted by federal statutes, a local safety hazard theory creates a genuine issue of fact." The court further stated: "Photographs in this case establish the corn did not severely obstruct the motorist's view of the tracks or trains on the track. The photographs establish that a vehicle could stop within the fifteen feet from the nearest rail as mandated by R.C. 4511.62 and look down the tracks to see an approaching train." The court noted that the evidence "conclusively established" that the train had sounded its whistle, and the corn was not growing on the railroad's property or right-of-way. Accordingly, the court found that CSX was entitled to summary judgment on the negligence claims against it.

{¶ 8} Our review of the trial court's decision to grant summary judgment is de novo. See *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65–66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 9} Wooten raises two assignments of error on appeal.

{¶ 10} I. "The trial court erred in granting summary judgment in favor of CSX Transportation, Inc., after failing to consider all evidence, after improperly weighing the evidence and after otherwise resolving a factual issue in favor of CSX upon which reasonable minds could differ."

{¶ 11} In her first assignment of error, Wooten claims that the trial court erred in concluding that there were no genuine issues of material fact as to whether the corn constituted an obstructive condition. She asserts that the trial court improperly weighed the evidence and failed to consider the affidavit of her expert, Dr. William Berg. She further argues that CSX had a duty to take steps to ensure the safety of the crossing, such as "the removal of obstructions, speed of operation, enhanced measures to warn motorists, and operational modifica-

tions, where there is a specific awareness * * * that vegetation impaired a clear and open view at the subject crossing." Wooten concludes: "The summary dismissal of claims upon this basis, upon factual conclusions reached through the court's personal inspection of photographs, is completely contrary to the purpose and policy of Civil Rule 56."

{¶ 12} A. *Federal Preemption under the Federal Railroad Safety Act*

{¶ 13} As an initial matter, we note that CSX has argued that Wooten's claims regarding the lack of adequate warning devices and the train's speed are preempted by federal law.

{¶ 14} The Federal Railroad Safety Act ("FRSA") was enacted, in part, to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." Section 20134(a), Title 49, U.S.Code; see *Shanklin v. Norfolk S. Ry. Co.* (C.A.6, 2004), 369 F.3d 978 ("*Shanklin II* "). The FRSA gives the United States Secretary of Transportation powers to "prescribe regulations and issue orders for every area of railroad safety," Section 20103, Title 49, U.S.Code, and provides that all "[l]aws, regulations, and orders related to railway safety * * * shall be nationally uniform to the extent practicable," Section 20106, Title 49, U.S.Code. See, also, *Shanklin II,* 369 F.3d at 985; *In re Miamisburg Train Derailment Litigation* (1994), 68 Ohio St.3d 255, 257, 626 N.E.2d 85. The statute includes a saving clause that reads: "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation * * * prescribes a regulation or issues an order * * * covering the subject matter of the State requirement." Section 20106. A state may also "adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order (1) is necessary to eliminate or reduce an essentially local safety or security hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce." Id.

{¶ 15} Thus, under the statutory scheme, state-law negligence claims are preempted by the FRSA if they attempt to impose a regulation in an area that is already occupied by the statute. *CSX Transp., Inc. v. Easterwood* (1993), 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387; *Freeman v. Norfolk & W. Ry. Co.* (1994), 69 Ohio St.3d 611, 635 N.E.2d 310. However, where a local safety hazard exists, an otherwise preempted common-law negligence claim may remain viable due to the FRSA's saving clause. Id.

{¶ 16} Wooten claims that CSX should have installed additional active warning devices to warn motorists of an oncoming train at the Peterson Road crossing. In *Norfolk S. Ry. Co. v. Shanklin* (2000), 529 U.S. 344, 120 S.Ct. 1467, 146

L.Ed.2d 374 (*"Shanklin"*), the United States Supreme Court explicitly held that where federal funds participate in the installation of warning devices, the federal regulations that prescribe a standard for the adequacy of the warning devices displace state law covering the same subject. Id.; see Section 646.214, Title 23, C.F.R.

{¶ 17} Here, CSX has presented substantial evidence that two crossbuck signs were installed at Peterson Road on December 8, 2005, as part of the Ohio Buckeye Crossbuck Program and that federal funds participated in the installation of those crossbuck signs. For example, Susan Kirkland, an employee of the Ohio Rail Development Commission, an independent commission with the Ohio Department of Transportation ("DOT"), indicated in her affidavit that the federal DOT authorized the Buckeye Crossbuck Program and that federal funds were encumbered to fund the program. Daniel Cores, Ohio DOT Administrator of the Office of Payroll and Project Accounting, stated in his affidavit that the state of Ohio received $271,756.85 from the Federal Highway Administration ("FHWA") for CSX's railroad grade-crossing-improvement project and that this amount was paid by the state to CSX. We find no genuine issue of material fact that federal funds participated in the installation of warning devices at the Peterson Road crossing prior to the accident. Accordingly, Wooten's state-law claim for failing to provide adequate warning devices is preempted by federal law. See *Shanklin,* supra; *Nye v. CSX Transp., Inc.* (N.D.Ohio 2004), 300 F.Supp.2d 529.

{¶ 18} Next, Wooten has asserted that the locomotive's speed through the Peterson Road intersection was excessive in light of the obstructive vegetation at the crossing. Pursuant to the FRSA, the Federal Railroad Administration has promulgated regulations setting the maximum allowable operating speeds for freight and passenger trains for each class of track on which such trains run. These regulations "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Easterwood,* 507 U.S. at 675, 113 S.Ct. 1732, 123 L.Ed.2d 387. Accordingly, a state-law tort claim against a railroad based on excessive speed is generally preempted by the FRSA if the train was operating within the federally prescribed speed limits. Id. at 675–676, 113 S.Ct. 1732, 123 L.Ed.2d 387; *Rivers v. CSX Transp., Inc.* (Apr. 10, 2002), Marion App. No. 9–01–59, 2002 WL 533397.

{¶ 19} In the present case, it is undisputed that the train was traveling within the prescribed speed limits. Wooten asserts, however, that her speed claim is not preempted by federal law, because the corn at the Peterson Road crossing constituted a "local safety hazard" within the meaning of the FRSA's saving provision, and thus a more stringent speed limitation was required. We disagree.

■ {¶ 20} Under the local-safety-hazard provision of the saving clause, state regulation is permitted only when local situations are "not capable of being adequately encompassed within uniform national standards." *Norfolk & W. Ry. Co. v. Pub. Util. Comm. of Ohio* (C.A.6, 1991), 926 F.2d 567, 571, citing 1991 H.R.Rep. No. 1194, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin. News 4104, 4117; *Rivers,* supra. As noted by the Sixth Circuit and others, the legislative history of the saving statute provides:

{¶ 21} " 'The States will retain authority to regulate individual local problems where necessary to eliminate or reduce essentially local railroad safety hazards. Since these local hazards would *not be statewide in character,* there is no intent to permit a State to establish Statewide standards superimposed on national standards covering the same subject matter.' " (Emphasis sic.) *Norfolk & W. Ry. Co.,* 926 F.2d at 571, quoting 1970 U.S.Code Cong. & Admin. News at 4117.

{¶ 22} As summarized by the *Rivers* court, "Most courts that have considered this issue have held that a 'specific individual safety hazard' must be a discrete and truly local hazard, such as a child standing on the railway. * * * Several courts have already ruled that conditions at a train crossing, like rail cars that obstruct a driver's view, do not constitute unique local conditions." *Rivers,* supra.

{¶ 23} In our judgment, the vegetation adjacent to Peterson Road and the railroad tracks did not constitute a local safety hazard. Although this particular field of corn allegedly obstructed Wooten's view of the railroad tracks as she approached the crossing, corn fields can and do exist beside many crossings in Ohio. In addition, the existence of obstructive vegetation is not a condition which cannot be "adequately encompassed within uniform, national standards." To the contrary, as discussed infra, the United States DOT has promulgated regulations which indicate that it can regulate vegetation along railroad tracks if it desires. See Section 213.37; Title 49, C.F.R.; *Shanklin II,* supra, 369 F.3d 978. Thus, we conclude that the corn field was not a local safety hazard within the meaning of Section 20106, Title 49, U.S.Code. Accordingly, we further conclude that Wooten's speed claim is preempted by the FRSA.

■ {¶ 24} Finally, Wooten has alleged that CSX may be liable under state law for failing to remove sight obstructions, in this case, obstructive vegetation. In *Shanklin II,* the Sixth Circuit concluded that a common-law claim for negligent failure to clear vegetation, i.e., maintain a clear sight distance, was not preempted by the FRSA. The court initially noted that the Supreme Court did not "explicitly extend the preemptive reach of § 646.214(b) to Shanklin's vegetation claim" in *Shanklin.* The court of appeals further concluded that the FRSA did not implicitly preempt obstructive, vegetation claims:

{¶ 25} "Section 646.214(b)(3) describes under what conditions certain types of warning devices are required; in other words, it ' "cover[s] the subject matter" of the adequacy of warning devices installed with the participation of federal funds.' *Shanklin*, 529 U.S. at 358, 120 S.Ct. 1467, 146 L.Ed.2d 374. Section 646.214(b)(4) mandates that the FHWA determine what types of warning devices should be installed when the circumstances laid out in § 646.214(b)(3) are not present. The regulations do not appear to focus on vegetational blockage or sight line limitations. At best, they 'relate to' or 'touch upon' vegetational growth; we cannot conclude that they 'cover,' in the sense of 'substantially subsume,' claims of negligence due to failure to clear away vegetation near a railroad bed. *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732, 123 L.Ed.2d 387.

{¶ 26} "[The railroad] argues that plaintiff's sight distance claim was plainly encompassed by 23 C.F.R. § 646.214(b)(3)-(4), because the regulation requires the DOT to consider, in assessing the need for automatic gates and flashing signals, the presence of 'high-speed train operation combined with limited sight distance,' 23 C.F.R. § 646.214(b)(3)(i)(C), and the presence of 'unusually restricted sight distance,' 23 C.F.R. § 646.214(b)(3)(i)(E). However, this argument takes the regulation's language out of context. While a visual encumbrance, be it overgrown vegetation, a structure, or the contour of the land, triggers the regulatory mandate for certain warning devices, and accordingly preempts common law claims regarding the adequacy of warning signals, it does not follow that the warning device regulations preempt an action based on the alleged failure to eliminate such a visual impediment. The regulations govern warning signals, not vegetation growth. 23 C.F.R. § 646.214(b)(3)-(4) do not define the terms 'limited' or 'unusually restricted' sight distance, indicate that any sight distance obstructions should be removed, set standards as to how much sight distance should be provided to motorists approaching a grade crossing, contain any guidelines relating to a railroad's obligation to maintain its grade crossings, or even mention 'vegetation' or 'right of way.'

{¶ 27} "Additionally, the DOT has promulgated other regulations governing the growth of vegetation, demonstrating that when the Department wants to regulate issues concerning vegetation, it has no problem doing so. In particular, 49 C.F.R. § 213.37 states: 'Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not * * * (b) [o]bstruct visibility of railroad signs and signals * * *.' 49 C.F.R. § 213.37(b). This regulation preempts any state-law claim regarding vegetative growth that blocks a sign immediately adjacent to a crossing, but it does not 'impose a broader duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming trains.' *O'Bannon v. Union Pac. RR. Co.*, 960 F.Supp. 1411, 1422–23 (W.D.Mo.1997) * * *. The comparison of 49 C.F.R. § 213.37 and

the adequate warning regulation persuasively shows that 23 C.F.R. § 646.214(b)(3) does not 'cover' actions based upon a negligent failure to clear vegetation." *Shanklin II*, 369 F.3d at 986–987. Accordingly, the Sixth Circuit concluded that the plaintiff's common-law tort claim based on obstructive vegetation was not preempted. *Shanklin II*, 369 F.3d at 988; see, also, *Strozyk v. Norfolk S. Corp.* (C.A.3, 2004), 358 F.3d 268.

{¶ 28} We find *Shanklin II* to be persuasive. Accordingly, we conclude that Wooten's negligence claim based on CSX's alleged failure to remove obstructive vegetation, i.e., corn in the southwestern area of the Peterson Road intersection, is not preempted by the FRSA.

{¶ 29} B. *Plaintiffs' Negligence Claim Based on Failure to Remove Obstructive Vegetation*

{¶ 30} Both a motorist and a railroad owe each other a duty of care to avoid collisions. *Barger v. Chesapeake & Ohio Ry. Co.* (1990), 70 Ohio App.3d 307, 590 N.E.2d 1369; *Cates v. Consol. Rail Corp.* (1995), 100 Ohio App.3d 288, 295, 653 N.E.2d 1229. A railroad has a duty of ordinary care to protect the safety of motorists. *Matkovich v. Penn Cent. Transp. Co.* (1982), 69 Ohio St.2d 210, 23 O.O.3d 224, 431 N.E.2d 652. "Specifically, Ohio law imposes certain duties upon railroads in terms of approaching, entering, and maintaining grade crossings. Railroads are required to sufficiently maintain and repair crossings where any public roadway intersects the railroad tracks. R.C. 4955.20. Railroads are required to attach a bell and whistle to each train, and the person in charge of the train is required to sound the whistle and continuously ring the bell until the engine of the train passes a crossing. R.C. 4955.32. Railroads are also required to erect crossbuck signing 'in accordance with the department of transportation manual for uniform traffic control devices' and a three-panel sign bearing the word 'yield' on the middle panel at all grade crossings. R.C. 4955.33." *Lintner v. Norfolk & W. Ry. Co.* (1997), 118 Ohio App.3d 838, 841, 694 N.E.2d 140. With regard to vegetation, R.C. 4955.36 provides:

{¶ 31} "Every railroad company shall destroy or remove plants, trees, brush, or other obstructive vegetation upon its right-of-way at each intersection with a public road or highway, for a distance of six hundred feet or a reasonably safe distance from the roadway of such public road or highway as shall be determined by the public utilities commission.

{¶ 32} "When any railroad company fails to destroy or remove such vegetation after ten-day written notice served on its local agent, the commission, board of county commissioners, board of township trustees, or legislative authority of a municipal corporation, in which the intersection is located, having the care of such road or highway, shall remove such plants, trees, brush, or other obstructive

vegetation and shall recover the cost of removal from the responsible railroad company." [1]

{¶ 33} A motorist also has a duty of care to avoid collisions. When approaching a crossing, a motorist is required "both to look and to listen for approaching trains, and the looking and listening must be at such time and place and in such manner as to be effective for that purpose." *Zuments v. Baltimore & Ohio RR. Co.* (1971), 27 Ohio St.2d 71, 72, 56 O.O.2d 40, 271 N.E.2d 813. Moreover, pursuant to R.C. 4511.62, whenever a motorist approaches a railroad grade crossing, she is required to "stop within fifty feet but not less than fifteen feet from the nearest rail of the railroad, and shall not proceed until [s]he can do so safely," when an approaching train (1) is "within approximately one thousand five hundred feet of the highway crossing emits a signal audible" and the train is an immediate hazard or (2) is plainly visible and is in hazardous proximity to the crossing. R.C. 4511.62(A)(4) and (5).

{¶ 34} Where the incontrovertible physical facts demonstrate that the motorist did not comply with her duty of care, then such failure was a proximate cause of the collision as a matter of law. *Zuments*, 27 Ohio St.2d at 72, 56 O.O.2d 40, 271 N.E.2d 813; *Cates*, 100 Ohio App.3d at 296, 653 N.E.2d 1229. "Where the view of the traveler approaching a railroad crossing is obstructed, such circumstances make necessary the use of greater precaution on his part and render his neglect to look or listen all the more culpable." *Cates*, 100 Ohio App.3d at 296, 653 N.E.2d 1229. However, a motorist's claim against a railroad is not precluded if she can demonstrate that the railroad was also negligent. See *Tolliver v. Consol. Rail Corp.* (1984), 11 Ohio St.3d 56, 11 OBR 201, 463 N.E.2d 389 (obstructive vegetation created fact question as to whether driver acted reasonably when she attempted to cross the tracks).

{¶ 35} In support of her assertion that the trial court improperly granted summary judgment on her obstructive-vegetation claim, Wooten relies primarily upon *Hicks v. Consol. Rail Corp.* (1993), 92 Ohio App.3d 636, 637 N.E.2d 19. In *Hicks*, a motorist who was struck by a Conrail train at a railroad grade crossing argued that dense vegetation near the crossing obstructed her view of the oncoming train. Photographs of the accident site appeared to show that "from a point on the highway approximately seventy to one hundred seventy feet south of the crossing, the view of the tracks to the east [was] partially obscured by trees." There was also testimony that a section of trees on the south side of the tracks obscured the crossing and that "it was not until a motorist reached the cross-buck

---

**1.** Section 213.37, Title 49, C.F.R. also requires railroads to control vegetation on railroad property that is on or immediately adjacent to a roadbed. Because the parties have not raised the issue, we state no opinion as to whether R.C. 4955.36 has been preempted by the FRSA.

signs that the vegetation no longer obstructed the view of the crossing." The plaintiffs' expert on railroad/highway grade-crossing safety, Dr. Berg, testified in his deposition that if the trees had not obstructed the view of the tracks, Hicks would have had additional time to perceive and react to the train; that, in light of Hicks's and the train's speeds, Hicks needed to be at least 340 feet from the crossing to bring her vehicle to a stop short of the crossing; and that the oncoming train was not visible from this distance. The court of appeals reversed the trial court's grant of summary judgment in favor of the railroad:

{¶ 36} "As in the Stoler case [Stoler v. Penn Cent. Transp. Co. (C.A.6, 1978), 583 F.2d 896], the case at bar involves a nighttime collision between a train and a car at a rural crossing. As in the Stoler case, photographs of the accident site illustrate that trees and shrubbery along the railroad might have prevented Hicks from seeing the oncoming train until it was too late to avoid the collision. Several witnesses testified that trees and vegetation located near the railroad crossing and in the railroad right-of-way did obstruct the motorist's view of the crossing and of the oncoming train. Construing the evidence most strongly in favor of appellants, we find that reasonable minds could differ as to whether the vegetation along the railroad crossing might have obstructed Hicks' view of the crossing and the oncoming train and contributed to the accident." Hicks, 92 Ohio App.3d at 640, 637 N.E.2d 19.

{¶ 37} We find Hicks to be distinguishable. The plaintiff in Hicks apparently relied upon two theories: (1) that Conrail's failure to remove obstructive vegetation on its right-of-way violated R.C. 2955.36 and thus constituted negligence per se, and (2) that due to the presence of obstructive trees and bushes, the railroad maintained a dangerous and "extra-hazardous" crossing. In the present case, it is undisputed that the corn at issue was located on private property outside of the railroad right-of-way. Accordingly, as noted by the trial court, R.C. 2955.36 has no application to the present circumstances and is not a basis for liability on the part of CSX.

{¶ 38} Wooten argues that the affidavit of her expert, Dr. William Berg, was not considered by the trial court and that, as did the expert's opinion in Hicks, Dr. Berg's statements created a genuine issue of material fact. She emphasizes that Dr. Berg—a railroad-crossings expert, accident reconstructionist, and human-factors engineer—concluded ,that her view of the northbound train was severely obstructed by the corn. Dr. Berg further stated that Wooten "had less than 2 sec to perceive and react once the top 2.5 ft of the lead locomotive came into her field of view. This finding is based upon measurements taken at the crossing, the height of the corn as described by witnesses, photographs of the crossing, and the height of the train. An available perception-reaction time of less than 2 sec is inadequate to provide a reasonable opportunity for taking

successful evasive action, especially when only the top 2.5 ft of the locomotive is visible, as opposed to its entire height of 15.67 ft."

{¶ 39} Accepting Dr. Berg's assertions regarding Wooten's perception-reaction times and his suggestions that the corn obstructed the view of the locomotive as Wooten approached the crossing, Dr. Berg's affidavit does not create an issue of fact as to CSX's responsibility for the sight restrictions. Unlike the obstructions in *Hicks,* in which the obstructive trees and vegetation were located near the railroad crossing and in the railroad right-of-way, it is undisputed that the corn at issue was located on private property and there is no evidence that the corn encroached on the railroad's right-of-way. Compare, also, *Missouri Pacific R. Co. v. Limmer* (Tex.Ct.App. 2005), 180 S.W.3d 803 (listing cases where sight restrictions caused by vegetation in right-of-way could be a basis for the railroad's negligence). CSX had no duty to remove visual obstructions outside of its right-of-way. *New York, Chicago & St. Louis RR. Co. v. Kistler* (1902), 66 Ohio St. 326, 342, 64 N.E. 130 ("The trees, shrubbery, and weeds outside of the right of way imposed no care or caution upon the company in running its train"); *Gallaga v. Grand Trunk W. RR.* (Aug. 4, 1999), N.D.Ohio W.D. No. 3:98CV7320, 1999 WL 681559.

{¶ 40} Moreover, upon review of CSX's and Wooten's photographs of the accident site, we agree with the trial court that the photographs demonstrate that "a vehicle could stop within the fifteen feet from the nearest rail as mandated by R.C. 4511.62 and look down the tracks to see an approaching train." Defendant's Exhibit G to Wooten's deposition shows a south-facing view of the tracks, taken from a height of 66 inches and a distance of 50 feet west of the west rail of the CSX mainline. Exhibit G suggests that from a distance of 50 feet, an individual's view of an oncoming train would not have been severely obstructed. Defendant's Exhibit H, attached to Wooten's deposition, depicts the view to the south of the crossing, taken approximately 22 feet west of the west rail of the CSX mainline and at a height of 66 inches. The photographer was apparently standing next to the crossbucks sign, which is where the stop line is painted on the roadway. From that vantage point, the tracks or trains on the tracks are not obstructed.

{¶ 41} Wooten asserts that CSX's photographs, particularly Exhibit G, are misleading. She notes that Dr. Berg stated in his affidavit that the photograph was not taken from the perspective from which Wooten would have seen the crossing. He stated that Wooten's eye level would have been about 3.5 feet or 42 inches above the pavement.

{¶ 42} We do not find that the trial court erred in considering the photographic evidence, nor do we find that Dr. Berg's affidavit creates a genuine issue of material fact as to whether CSX was negligent. While Dr. Berg's affidavit

informed the trial court that Wooten's perspective may have been somewhat different from that represented by the photographs, the trial court was competent to evaluate the photographs and to determine whether, accepting Dr. Berg's assertions as true, a genuine issue of material fact existed. Upon review of Exhibit H (taken from 22 feet from the westernmost track), it is apparent that a motorist's view of the tracks and signage would not have been obstructed, even taking into account that the motorist would have been situated 22 inches lower than the camera level and that the front end of the vehicle may have extended several feet closer to the tracks. Based on the photographs, the trial court could have properly concluded that there was no genuine issue of material fact that, at a distance of 15 feet from the westernmost tracks, Wooten's view would not have been obstructed. In sum, we conclude that the trial court did not err when it granted summary judgment to CSX on Wooten's and Ashley's claims against it.

{¶ 43} The first assignment of error is overruled.

{¶ 44} II. "The trial court erred in dismissing Staunton Township, the Board of Miami County Commissioners and the Miami County Engineer as defendants upon summary judgment, after improperly 'weighing the evidence' upon which reasonable minds could differ and upon the legal conclusion that the governmental entities had no liability absent obstruction of a traffic signal or sign."

{¶ 45} In her second assignment, Wooten claims that the trial court improperly granted summary judgment to Miami County and Staunton Township.

{¶ 46} R.C. 5535.01 divides the public highways of the state into three distinct classes: state roads, county roads, and township roads. State roads include the roads and highways on the state highway system, county roads include all roads which are or may be established as a part of the county system of roads, and township roads include all public highways other than state or county roads. Id. The state, counties, and townships are responsible for the maintenance of their respective roads. R.C. 5535.08(A); R.C. 5535.01(B) and (C); see, also, R.C. 5571.02 (requiring townships to keep township roads in good repair). The board of county commissioners may assist the board of township trustees in maintaining all township roads. R.C. 5535.01(C). Moreover, "the county or township, by agreement between the board of county commissioners and the board of township trustees, may contribute to the repair and maintenance of the roads under the control of the other." R.C. 5535.08(A). R.C. 2744.02(B)(3) also imposes a duty on political subdivisions to keep roads within their control open, in repair, and free from nuisance. See *Engle v. Salisbury Twp.,* Meigs App. No. 03CA11, 2004-Ohio-2029, 2004 WL 869362, ¶ 20–21; *State ex rel. Jones v. Smith* (May 15, 1998), Trumbull App. No. 97–T–178, 1998 WL 258160. Although R.C. 5579.08 requires the cutting of noxious weeds by the board of township trustees of the respective township, that obligation applies only to

township roads. See *White v. Ohio Dept. of Transp.* (1990), 56 Ohio St.3d 39, 42, 564 N.E.2d 462; *State ex rel. Duncan v. Chippewa Twp. Trustees* (Dec. 14, 1994), Wayne App. No. 2833, 1994 WL 700092; see R.C. 5579.04 (requiring county commissioners, township trustees, and street commissioners of municipalities to remove noxious weeds from roads within their jurisdictions); 1980 Ohio Atty.Gen. Ops. No. 80–040.

{¶ 47} R.C. 5543.01 sets forth the duties of the county engineer. Under that statute, the county engineer generally has charge of construction, reconstruction, improvement, maintenance, and repair of all bridges and highways within the engineer's county; construction, reconstruction, resurfacing, or improvement of roads by boards of township trustees, as specified; and construction, reconstruction, resurfacing, or improvement of the roads of a road district under section 5573.21 of the Revised Code. R.C. 5543.01(A); see *Isreal v. Jefferson Twp. Bd. of Trustees* (Dec. 10, 1990), Montgomery App. No. 12071, 1990 WL 205115 (describing the duties of the county engineer).

{¶ 48} In the present case, the parties do not dispute that Peterson Road is a county road. Thus, absent an agreement between Miami County and Staunton Township, the county had the duty to maintain Peterson Road and to keep it clear of nuisance; Staunton Township did not. Moreover, we agree with the trial court that because the corn was not a noxious weed and was growing along a county highway, R.C. 5579.08 has no application. Accordingly, the trial court properly granted summary judgment in favor of Staunton Township.

{¶ 49} Miami County asserts that it is not liable, as a matter of law, because the corn at issue was not in the county's Peterson Road right-of-way and Wooten was the sole proximate cause of the collision. We find the fact that the corn was not in Miami County's right-of-way to be dispositive.

{¶ 50} In *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 587 N.E.2d 819, the Supreme Court interpreted the former R.C. 2744.02(B)(3) in conjunction with the former R.C. 723.01, which required municipal corporations to keep public highways, streets, and avenues "open, in repair, and free from nuisance." In that case, the township asserted that its liability was limited to nuisances that existed "on the paved or travelled portion of the highway or where the nuisance interfered with a traffic or safety control device." The Supreme Court rejected the contention that liability was limited to physical conditions in the roadway itself. It reasoned that "[i]n determining a township's duty under R.C. 2744.02(B)(3) or a municipality's under R.C. 723.01, the focus should be on whether a condition exists within the political subdivision's control that creates a danger for ordinary traffic on the regularly travelled portion of the road." The court stated:

{¶ 51} "The roadway, the space immediately above the roadway, the shoulder, the berm, and the right-of-way are all under the control of the political subdivision. See present R.C. 4511.01(UU)(2). The township has a duty to keep the areas within its control free from nuisance, *i.e.,* conditions that directly jeopardize the safety of traffic on the highway. Where the township fails in its duty, it may be liable for injuries proximately caused by the nuisance.

{¶ 52} "A permanent obstruction to a driver's visibility can be a nuisance which makes the usual and ordinary course of travel *on the roadway* unsafe. A visibility obstruction can be as hazardous to the highway's safety as a malfunctioning traffic light, a pothole in the roadway, or a rut in the shoulder. This is particularly true when a driver, stopped at an intersection, is unable to see approaching cross-traffic. The relevant focus is on the *effect* of the obstruction on the highway's safety, not on the *nature* of the particular obstruction. Whether the alleged obstruction in the present case (a cornfield) constitutes a nuisance which makes the highway unsafe and whether this was the proximate cause of the accident that occurred are questions upon which we express no opinion because such determinations require findings of fact.

{¶ 53} "Accordingly we hold that a permanent obstruction to visibility in the right-of-way, which renders the regularly travelled portions of the highway unsafe for the usual and ordinary course of travel, can be a nuisance for which a political subdivision may be liable under R.C. 2744.02(B)(3)." (Emphasis sic.) *Manufacturer's Natl. Bank,* 63 Ohio St.3d at 322–323, 587 N.E.2d 819.

{¶ 54} Although *Manufacturer's Natl. Bank* recognized that permanent obstructions to visibility *in the right-of-way* may constitute a nuisance, it did not extend a political subdivision's liability to obstructions that exist on private property over which the governmental entity does not have control. Here, the corn at issue did not extend into Miami County's right-of-way or property over which the county had control, nor did it conceal or obstruct any signal or sign. Thus, the county had no duty to remove the alleged obstructive vegetation. Accordingly, the trial court properly granted summary judgment in favor of Miami County.

{¶ 55} The second assignment of error is overruled.

{¶ 56} The judgment of the trial court is affirmed.

Judgment affirmed.

DONOVAN, J., concurs.

GRADY, Judge, dissenting in part and concurring in part.

{¶ 57} I would not find that the testimony of Dr. Berg, plaintiffs' expert, supported by photos, fails to preserve a genuine issue of material fact with respect to Wooten's opportunity to see and avoid the oncoming train. However, I agree that the holding in *Hicks v. Consol. Rail Corp.* (1993), 92 Ohio App.3d 636, 637 N.E.2d 19, is distinguishable with respect to the central issue concerned, which is whether defendant CSX Railroad breached a duty of care it owed Wooten.

{¶ 58} In *Hicks,* a dense stand of trees growing on and adjacent to the railroad's right-of-way allegedly prevented the plaintiff from seeing an oncoming train. Trees take many years to achieve that state of growth and density. Existence of such a relatively permanent condition charged the railroad with knowledge of it, and that knowledge imposed on the railroad a duty to take reasonable measures to avoid the hazard to motorists that its passing trains presented.

{¶ 59} In the present case, a growth of standing corn is alleged to have created a similar obstruction. However, corn is planted seasonally and grows rapidly, far more so than trees. Therefore, even if the corn obstructed Wooten's opportunity to see the oncoming train, CSX had no duty to take additional steps to avoid the risks to passing motorists such as Wooten that the obstruction created. That would include removing the corn as well as reducing the speed of its trains below the limit permitted by applicable regulations, which are the measures plaintiffs contend it should have taken.